**ASSOCIATION OF RELATIVES AND FRIENDS OF AIDS PATIENTS (A.F.A.P.S.); David Diaz Fernandez; Maribel Robles Martinez; Angel Morales Casiano; Enrique Valentin Santiago, Hector Santiago Torres, Plaintiffs,**

v.

**REGULATIONS AND PERMITS ADMINISTRATION OR ADMINISTRACION de REGLAMENTOS y PERMISOS (A.R.P.E.); Salvador Arana Martinez, in his official capacity of Administrator; Eleazar Garcia Marrero, in his official capacity of Director of the Carolina Regional Office, Defendants.**

Civ. No. 90–1672–JAF.

United States District Court, D. Puerto Rico.

June 13, 1990.

As Amended June 15, 1990.

Nora Vargas Acosta, San Juan, P.R., for plaintiffs.

Lou Ann Delgado, Atty., Federal Litigation Div., Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

This heated controversy involves a community divided against itself over a plan to establish a hospice for patients in the terminal stages of Acquired Immune Deficiency Syndrome ("AIDS"). The plaintiffs include five persons suffering from AIDS [1] and the Association of Relatives and Friends of AIDS Patients (hereafter referred to by its Spanish acronym "A.F.A.P. S."). In April 1990, codefendant Administración de Reglamentos y Permisos ("A.R. P.E.") denied A.F.A.P.S.'s application for a special use permit to open an AIDS hospice in the Sabana Ward of the Municipality of Luquillo, Puerto Rico, claiming the land on which the hospice was located is zoned exclusively for agricultural purposes. Plaintiffs allege this reason is a pretext and that the denial was actually based on illegal discrimination against persons infected with AIDS in violation of their rights under the fourteenth amendment and the federal Fair Housing Act. 42 U.S.C. §§ 3601–3631. They brought this action, pursuant to 42 U.S.C. section 1983, for injunctive relief allowing them to open the hospice and for attorney's fees. Jurisdiction is based on 28 U.S.C. section 1331 and 42 U.S.C. section 3613(a).

### I. BACKGROUND AND FACTUAL DETERMINATIONS

The court began hearing this case on the

1. A sixth person suffering from AIDS who was to be joined as a plaintiff in this case died before the action was filed.

morning of June 1, 1990.[2] Six witnesses were called by plaintiffs and one by the defendants. Documentary evidence was submitted by both sides. The hearing continued on June 4, 1990, at which time the court viewed videotapes of local television programs in which several of the parties participated in discussions related to this controversy. Finally, on June 5, 1990 this judge, in the presence of counsel, conducted an on-site inspection of the proposed hospice site and surrounding areas. Based on all the evidence received, the court makes the following determinations of fact.

1. A.F.A.P.S. is a non-profit corporation established under the laws of Puerto Rico and dedicated to providing emotional, practical, and medical assistance to AIDS patients and their families. Since its incorporation in February 1989, A.F.A.P.S. has engaged in a variety of projects designed to heighten public awareness of the plight of AIDS victims. A.F.A.P.S.'s membership is drawn largely from four different evangelical religious organizations and its funding comes from private donations. A.F.A.P.S was represented in court through the testimony of its Executive Director, Jorge Serrano, and his wife, Mariana Rodríguez de Serrano, who serves as A.F.A.P.S.'s Secretary. The Serranos are residents of Luquillo, Puerto Rico.

2. Codefendant A.R.P.E. is an agency of the Commonwealth of Puerto Rico charged with the responsibility of issuing land use permits. A.R.P.E. carries out its functions through various offices corresponding to certain regions in Puerto Rico. The town of Luquillo comes under the authority of A.R.P.E.'s Carolina Regional Office. A.R.P.E. was represented at the hearing by Eleazar García Marrero, the Director of the Carolina Region.

3. On or about November 1989, A.F.A.P.S. drafted a proposal to establish a permanent care center, or hospice, for terminal AIDS patients in Luquillo's Sabana Ward. According to the proposal, the hospice would provide a home for up to ten patients in the final stages of the disease. The patients are to be cared for by a multidisciplinary team made up of a director, a medical doctor, three nurses, a clergyman, an ambulance driver, and a cook. The purpose of a hospice is to afford AIDS patients a place to "die with dignity" in a home-like setting while providing necessary medical and counseling services to the patients and their family members.

4. On February 15, 1990, A.F.A.P.S. entered into a lease agreement with the United Evangelical Church of Puerto Rico ("Church") whereby A.F.A.P.S. leased a concrete structure as a site for the hospice. Many A.F.A.P.S. members, including the Serranos, are also members of the Church and participate in Church activities. The rented structure, unused for several years, consists of four bedrooms, a kitchen, and two bathrooms.[3] For the past several months A.F.A.P.S. has invested time and money in repairing the building, and today it is nearly ready for use. The money for the repairs has come, in part, from a $75,-000 donation by the United Fund of Puerto Rico. Aside from the repairs, A.F.A.P.S. has solicited several indigent AIDS patients in the Luquillo area as potential clients. Five of these patients are coplaintiffs in this case. All are in present need of medical care and housing, or soon will be as their level of health declines.[4]

---

**2.** At the hearing, we consolidated the request for a preliminary injunction with the trial for permanent injunctive relief. Fed.R.Civ.P. 65(a)(2). The parties voiced no objection to the determination.

**3.** Miriam Figueroa Ramírez, the Administrator of the Church's conference center and a lifelong resident of Luquillo, testified that the building proposed as the hospice site had previously been used as a house, a ceramics store and a dispensary for the Department of Health.

**4.** The testimony of coplaintiff María López Martínez, an AIDS patient, is representative of the needs of potential hospice clients. Ms. López, age 37, stated that she and her three children are currently living with her father, who is 72. Ms. López is at present suffering from Kaposi's Sarcoma and oral candidiasis, two AIDS–related illnesses. She is not a participant in any health plan. She is a member of the United Evangelical Church. She stated that as her condition worsens her father will be unable to care for her, and so she is relying on

5. The proposed hospice is located on a 45–cuerda[5] tract of Church-owned land known as the "Yuquiyú Center."[6] Also located on the Yuquiyú grounds, up a small hill, are other buildings used by the Church for its religious and social activities, including a 300–seat conference hall and small dormitories used to house Church members visiting Yuquiyú for religious "retreats." This property, owned by the Church since 1973, has never been used by it for agricultural purposes.

6. Miriam Figueroa Ramírez, age 37, is the Administrator of the Yuquiyú Center and a lifelong resident of Luquillo. She testified that for the last thirty years there has been little if any agricultural activity in the region surrounding the Church property, an observation that was confirmed by the court during an on-site inspection. Also testified to, and also confirmed, was the existence of numerous non-agricultural uses in the area presently zoned A–1, particularly, a flower shop, a hardware store, a furniture factory, a home for the aged, several newly-constructed residences, an open-air recreational area including a baseball diamond and a concrete basketball court, a small grocery store, a fast-food restaurant, and a gas station. Ms. Figueroa stated that many of these businesses, particularly the nursing home, restaurant, and gas station, were established within the last three years. On cross examination she stated that she did not know which, if any, had been granted permits by A.R.P.E.

7. From the outset, A.F.A.P.S.'s attempt to establish an AIDS hospice at the Sabana Ward site was met with organized and vocal opposition from a group of Luquillo residents calling themselves the "Residents' Committee" ("Consejo de Residentes"). The opposition began around November 1989, when residents noticed that the hospice site was being repaired. Residents filed a complaint with A.R.P.E., but were told at the time that A.R.P.E. had no basis to intervene. Shortly thereafter, the Residents' Committee erected a large zinc-roofed structure directly across the road from the hospice. They use this structure, which they call "Dignity Plaza," to maintain a round-the-clock vigilance of A.F.A.P.S.'s activities at the hospice. The Residents' Committee has expressed its opposition to the hospice through petitions, picket lines, graffiti, an administrative complaint, letters to various public bodies, a local court action,[7] and appearances on local television programs. Ms. Figueroa and the Serranos testified to receiving threats from Residents' Committee members due to their support of the hospice. Their efforts to dialogue with community residents failed. Among the reasons expressed by Residents' Committee members for opposing the hospice are the possibility that mosquitoes might transmit the AIDS virus to the community; the undesirability of having former drug users and homosexuals living in Sabana Ward; the belief that the hospice site is flood prone, thus giving rise to a risk of contamination through inundation; the risk of transmitting AIDS-related infections such as pneumonia; the risk that the hospice might decrease the value of surrounding property; the risk that hospice residents might pose a danger to students attending a nearby school.

8. Against this background, A.F.A.P.S. applied to A.R.P.E. for a special use permit to operate the hospice on February 16, 1990. Jorge Serrano testified that he met with Regional Director García on three separate occasions to discuss the hospice. Ser-

---

the A.F.A.P.S. hospice for medical attention and housing.

**5.** A "cuerda" is a Spanish measure equivalent to 0.97 acre. Velázquez, *Diccionario de los Idiomas Inglés y Español* 193 (1973); *Culebras Enterprises Corp. v. Rivera Ríos,* 813 F.2d 506, 508 (1st Cir.1987).

**6.** The precise location of the hospice is Highway 983, kilometer 3.7, Sabana Ward, Luquillo, Puerto Rico.

**7.** On March 12, 1990, while A.F.A.P.'s application before A.R.P.E. was still pending, Luquillo residents filed an action in Puerto Rico Superior Court, Humacao Section, against A.F.A.P.S. and A.R.P.E. seeking to block the opening of the hospice. *Consejo de Padres de la Escuela Segunda Unidad de Sabana de Luquillo v. Concilio Evangélico de Puerto Rico,* Civil No. CS90–379. That action was dismissed on ripeness grounds.

rano testified that at one point he was told it would be "an uphill struggle" to get the permit due to the amount of publicity the case had received. Serrano further testified that at no time before the permit was denied did García mention agricultural zoning as a possible barrier to granting the use permit. A.F.A.P.S. was not granted a public hearing on its application. Serrano testified that on or around April 27, 1990 he saw members of the Residents' Committee celebrating, and it was from them that he first learned the permit had been denied. Serrano then went to A.R.P.E. to ask how the Residents' Committee could know of the denial before the applicant and was told that A.R.P.E. had so informed the Residents' Committee's attorney. The only reason given for the denial of the permit was that the land was zoned A–1 Agricultural and that the use requested was therefore prohibited by Topic 3,[8] Section 5.03 of the Special Zoning Regulations for Non–Urban Municipalities Bordering the Caribbean National Forest (hereafter referred to as the "El Yunque Regulations"), which became effective on March 31, 1983.

9. Regional Director García testified concerning the reason the permit was denied. He stated that because of the zoning classification A.R.P.E. had no choice but to deny the permit. He characterized the decision as "ministerial." He noted that in 1988 A.R.P.E. granted a permit for an AIDS hospice in Río Piedras. On cross examination García admitted that he knew the land in question was zoned A–1 as early as November 1989 but did not immediately deny the A.F.A.P.S. permit because he was looking for a "loophole" through which a permit might have been granted. He further stated that he had considered whether A.F.A.P.S. could be granted a variation but determined that this was not possible. He testified that he had received a letter from the office of Senator Fernando Martín García noting the "strong public opposition" to the proposed hospice. He stated that he took the letter to mean that Senator Martin "was on the side of public opinion" on the hospice issue. He also noted strong community opposition in a report dated March 7, 1990.

10. Prior to the denial of the permit, codefendant García was interviewed about A.R.P.E.'s position concerning the Luquillo hospice controversy on three separate editions of "Carmen Jovet: Controversial," a local television talk show. During these programs García expressed three concerns: a) that he would have to investigate whether the land in question was in a flood-prone zone; b) that public opinion was a consideration in the decisionmaking process; and c) that A.R.P.E. would not have jurisdiction to grant a permit if AIDS were determined to be a "contagious" disease. García also stated that the only relevant difference between the proposed use of the Yuquiyú site and its previous uses was that the proposed use involves a care facility for terminally-ill AIDS patients. García at no time mentioned either the fact that the land was zoned agricultural or the underlying considerations of the El Yunque Regulations.

11. Plaintiffs called two physicians to testify as experts on the AIDS epidemic, the ways in which AIDS is and is not transmitted, the course of the disease, and the effect of the AIDS epidemic on Puerto Rico. First, plaintiffs subpoenaed Dr. Rafael Rivera Castañón, a physician and epidemiologist with thirty-two years experience and the Director of the Puerto Rico's Latin American Center for Sexually Transmitted Diseases ("C.L.E.T.S"). He has participated in several AIDS studies and has presented papers on AIDS internationally. Plaintiffs also presented the testimony of Dr. Jorge Luis Garib, the Medical Director of the AIDS Institute of Puerto Rico. Dr. Garib is the author of the book *AIDS: Lo Que Todos Debemos Saber* (*"What Everyone Should Know"*), as well as numerous articles on AIDS. He has participated in studies on scientific and economic aspects of the epidemic in Puerto Rico.

The testimony of Dr. Rivera and Dr. Garib was completely unchallenged by de-

---

**8.** The denial of the use permit cites "Topic 7" rather than "Topic 3." Regional Director García, however, testified that this was likely a typographical error and that "Topic 3" was actually intended.

fendants. Therefore, based on their testimony, the court makes the following factual determinations relating to AIDS and the HIV epidemic in Puerto Rico.

a. AIDS is caused by infection with the Human Immunodeficiency Virus ("HIV"). Technically, the term "AIDS" refers only to the final stages of an ongoing and progressive HIV infection. During the initial stages, persons infected with HIV might develop cold-like symptoms but often show no symptoms at all. An HIV–infected person typically remains asymptomatic for up to four or five years while the virus gradually destroys the body's capacity to fight off infections and other diseases. Once a person's immune system is sufficiently impaired that person becomes prone to a variety of opportunistic infections and tumors. It is at the final stages of the disease that one is diagnosed with having AIDS.

b. HIV is not an easy virus to transmit. There are only three known methods of transmitting the HIV virus: (1) sexual relations with an infected person involving the exchange of bodily fluids; (2) direct contact with contaminated blood—*i.e.*, through a transfusion or a syringe; and (3) transmission from a mother to an unborn child through the placenta.

c. Studies conducted by the Center for Disease Control in Atlanta indicate that HIV cannot be transmitted by mosquitoes or casual contact. Moreover, persons in the terminal stages of AIDS are typically bed-ridden and have very little energy. For these reasons, a hospice for terminal AIDS patients poses virtually no risk to the health of community members.

d. In Puerto Rico there are 4,340 confirmed cases of AIDS, of which 2,705 persons have already died. Puerto Rico's per capita incidence of AIDS is second only to Washington D.C. in the nation. There are an estimated 40,000 to 80,000 persons in Puerto Rico who are currently infected with HIV but who have not yet developed AIDS. Sixty to seventy percent of Puerto Rico's HIV–infected population are poor

and have no health insurance. Many HIV–infected people are in need of jobs, counseling and living quarters. A patient in the terminal stage of AIDS is typically better off in a hospice situation than in a hospital because his immune system is not capable of fighting off intra-hospital acquired infections. Hospice care is also considerably less expensive than hospital treatment, which for an AIDS patient can be as much as $1,000 per day. There are presently only three hospices for AIDS patients in Puerto Rico with a total of fewer than thirty beds. There is not a hospice located in the Carolina Region, of which Luquillo is a part. There are currently 420 confirmed AIDS cases in the Carolina Region.

e. There is a clear relationship between discrimination against HIV-infected individuals and difficulties in controlling the AIDS epidemic. Many infected people will not come forward to be tested for HIV antibodies, and therefore will not receive counseling and treatment, if they fear they will be denied housing, employment, and other basic needs due to their HIV-infected status. These undetected AIDS carriers are more likely to pass the virus on to others. Fighting discrimination against HIV-infected persons is a health priority.

12. Dr. Rivera also testified that in November of 1989 he was contacted by Puerto Rico's Secretary of Health concerning letters received from Luquillo residents protesting the proximity of the proposed hospice to the school.[9] Dr. Rivera stated that he went to the site to try to talk with the residents about HIV transmission and to distribute literature and educational materials concerning the disease. The response of the residents, according to Dr. Rivera, was "hostile": "They said they knew all they needed to know about AIDS and did not want to be educated." Dr. Rivera then conducted a telephone survey of the complainants to determine the nature of their concerns and the extent of their knowledge about HIV infection. Based on the survey and his personal experience, Dr. Rivera

---

**9.** The nearest non-Yuquiyú building to the proposed hospice site is a public school. The school is located just over 200 meters from the hospice and the two structures are divided by a thick grown of trees and vegetation.

concluded that there was "a big misunderstanding" among many community members about AIDS and HIV and that many people mistakenly believed AIDS can be transmitted by floods, mosquitoes or casual contact.

## II. DISCUSSION

### A. *Abstention*

■ Before reaching the merits we must address defendants' argument that this court should abstain from deciding this case under the doctrine espoused in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). The so-called *Burford* doctrine deems that a federal court may decline to exercise its jurisdiction where "the state has a unified scheme for review of its administrative orders and federal intervention in cases in which diversity is present would have a disruptive effect on the state's efforts to establish a coherent policy on a matter of substantial public concern." 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* 485 (1978).

For a number of reasons, we find that abstention is not appropriate in the present case. First, both *Burford* and *Thibodaux* were cases in which the federal court was exercising its diversity jurisdiction and deciding complicated questions of state law previously undecided by the local courts. Here, this case is before the court pursuant to its federal question jurisdiction. Moreover, this case does not require us to delve into complicated questions of local law. Rather, this case calls only for a straightforward application of a federal statute and the fourteenth amendment to the federal constitution. *See Corporación Insular de Seguros v. García*, 680 F.Supp. 476, 485 (D.P.R.1988). We note that if *Burford* abstention is appropriate here, it would be appropriate any time a plaintiff brought a Fair Housing Act claim against a state government entity. Furthermore, there is no threat in this case of disruption to a "unified scheme for review of administra-

tive orders." *See, e.g., Bath Memorial Hospital v. Maine Health Care Fin. Com'n.*, 853 F.2d 1007 (1st Cir.1988). Finally, we note that abstention, based on any doctrine, is the exception and not the rule, *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976), and that abstention is particularly inappropriate in civil rights cases. *See Corporación Insular de Seguros*, 680 F.Supp. at 479, and cases cited therein. In short, defendants have offered no persuasive reason why "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them" should be set aside in this case. *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246; *see also United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184 (8th Cir. 1974) (affirming district court's refusal to abstain from hearing claim that adoption of city zoning ordinance violated Fair Housing Act).

### B. *The Fair Housing Act*

The Fair Housing Act, as amended effective March 12, 1989, grants private litigants the right to challenge discriminatory housing practices. 42 U.S.C. § 3613(a). Courts have given broad interpretation to the statute so as to fully effectuate Congress's remedial purposes. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 370, 102 S.Ct. 1114, 1119, 71 L.Ed.2d 214 (1982). Included among the Fair Housing Act's prohibitions is discrimination on the basis of a physical or mental handicap. Section 3604(f)(1) makes it unlawful

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

Section 3617 further provides that

[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on

account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

■ There is little question that persons terminally ill with AIDS are considered "handicapped" within the meaning of the Fair Housing Act. Indeed, the legislative history of the amended act indicates that Congress intended to include AIDS sufferers within the class of protected persons:

The Fair Housing Amendments Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

. . . .

People with Acquired Immune Deficiency Syndrome (AIDS) and people who test positive for the AIDS virus have been evicted because of an erroneous belief that they pose a health risk to others. All of these groups have experienced discrimination because of prejudice and aversion—because they make non-handicapped people uncomfortable. H.R. 1158 clearly prohibits the use of stereotypes and prejudice to deny critically needed housing to handicapped persons. The right to be free from housing discrimination is essential to the goal of independent living.

1988 U.S.Code Cong. & Admin.News at 2179. *See also Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 728–30 (S.D.Ill. 1989) (finding AIDS patients to be "handicapped" under the Fair Housing Act).

■ While the Fair Housing Act prohibits discrimination against handicapped individuals, including AIDS patients, it does not prevent a defendant from denying housing in order to preserve the health and safety of the community. Section 3604(f)(9) provides: "Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). In this case, however, there is absolutely no evidence supporting the conclusion that the tenancy of ten terminal AIDS patients carries a significant threat to the safety of the community. To the contrary, the uncontested scientific and medical evidence establishes that HIV is not readily transmittable through flood, mosquitoes or casual contact, and that the presence of the hospice poses no risk to the community at large. A.R.P.E.'s denial of the permit, therefore, cannot be justified on public health grounds.

A.R.P.E. apparently concedes this much, for its sole argument on the merits is that plaintiffs have failed to prove that illegal discrimination played any role in its decisionmaking. Rather, A.R.P.E. contends that its decision to deny the permit was based exclusively on the fact that the land in question was zoned A–1 Agricultural.

■ There are two methods of showing discrimination in violation of section 3604. The first method requires a showing of "discriminatory intent." Under this method, plaintiffs must prove that their handicap formed some part of the basis for A.R.P.E.'s actions; it need not be the sole motivating factor. *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2nd Cir.1979); *Baxter, supra,* at 732. The second method, known as "disparate impact" analysis, examines whether the effect of a defendant's action is unnecessarily discriminatory even though no intent to discriminate is shown. *See Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977).

### 1. Discriminatory Intent

■ We begin with the doctrine of "discriminatory intent." Plaintiffs rely on *Baxter v. City of Belleville, Ill., supra,* a

case similar in many ways to the one at hand. In *Baxter*, the defendants denied plaintiffs a special use permit to open a residence for AIDS patients following two separate hearings at which city officials expressed apprehension over the presence of HIV-infected persons in the community. The district court granted a preliminary injunction in favor of plaintiffs, finding that "irrational fear of AIDS was at least a motivating factor in the City's refusal to grant [the] special use permit." *Id.* at 732. The *Baxter* court further stated that "due to that fear, the City's actions were both intentional and specifically designed to prevent persons with HIV from residing" at the proposed location. *Id.*

Defendants attempt to distinguish *Baxter* from the case at hand by claiming that here the expressions of "irrational fear" were made by community members and cannot be attributed to A.R.P.E. Along this same line, defendants note that in the instant case no public hearing was held, and thus, "[t]here is no evidence that A.R.P.E. ever entered into a detailed analysis of plaintiffs' project during the evaluation of their request." Defendants' Brief at 20. Both of these assertions deserve comment.

We agree with defendants to the extent that in the ordinary course of affairs a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents. On the other hand, **a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.** A racially discriminatory act would be no less illegal simply because it enjoys broad political support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter. Addressing this issue in the context of equal protection analysis, the Tenth Circuit noted that

> [i]f proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection. In

our opinion it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.

*Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir.1970).

■ Furthermore, the court finds defendants' glee over not conducting a "detailed analysis of plaintiffs' project" a bit curious. Although it is true in this case that we do not have statements made by A.R.P.E. officials at a public hearing, the court fails to see why the failure to establish a factual record in an issue of great public concern necessarily cuts in A.R.P.E.'s favor. In the first place, it is a general principle of administrative law that administrative decisions should find some support in a factual record. *See, e.g., Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). More importantly, direct statements by public officials at a public hearing are not the only way of proving an agency acted with discriminatory intent; such intent may also be proven through circumstantial evidence. *Id.; United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1185 n. 3 (8th Cir.1974). Finally, although A.R.P.E. did not grant plaintiffs a public hearing on their application, the Carolina Regional Director did appear three times to discuss the case on a local television show. These statements and other circumstantial evidence provide at least some glimpse of A.R.P.E.'s motivations.

After considering the evidence in its totality, the court cannot avoid the conclusion that A.R.P.E. acted in furtherance of the misguided and discriminatory notions held by many Luquillo residents concerning AIDS patients or at least bowed to political pressure exerted by these residents. By the same token, the court finds A.R.P.E.'s stated reason for denying the permit to be a pretext. In making this determination, we find a number of points persuasive.

First, that A.R.P.E. was pressured and lobbied by opponents of the hospice to deny the A.F.A.P.S. permit is undeniable. Opposition to the hospice was repeatedly expressed in a manner demonstrating an in-

tent to discriminate against AIDS patients and a misunderstanding of the way in which the AIDS virus is transmitted. *Cf. Black Jack*, 508 F.2d at 1185 n. 3. In short, the residents did not want AIDS patients living among them "because they make non-handicapped people uncomfortable." 1988 U.S.Code Cong. & Admin.News at 2179. Moreover, local opposition was duly noted by A.R.P.E. decisionmakers, one of whom publicly remarked that community opinion would play a role in the decision. There is also evidence in the record that A.R.P.E. received pressure from political leaders who themselves expressed concern over public opposition to an AIDS hospice at Sabana Ward.

Second, prior to the denial of the use permit there is no evidence that the A–1 zoning classification was a factor in A.R.P.E.'s decisionmaking. Jorge Serrano testified that during his three meetings with Regional Director García agricultural zoning was never raised as a possible barrier to the application. Serrano did testify that he was told getting a permit would be an "uphill battle" due to the publicity the case had received.[10] Similarly, García did not raise the zoning issue during his three television interviews, although he knew of the A–1 classification as early as November 1989. To the contrary, García at various times mentioned flooding,[11] contagion and public opinion as factors to be considered in evaluating the application. The total absence of any pre-denial discussion of the A–1 classification, coupled with A.R.P.E.'s public discussion of other factors, in particular the importance of public opinion, persuades the court that A.R.P.E.'s late blooming concern over agricultural zoning was less than genuine.[12]

Third, and contrary to the testimony of Regional Director García, A.R.P.E. clearly had authority to grant the special use permit if it wished to. Although the land in question was zoned for agriculture, Topic 4, Section 17.01 of the El Yunque Regulations allows A.R.P.E. to grant a variation when to do so would be "in the best interest of the community." A.R.P.E. also had the authority to grant plaintiffs a public hearing (*see* Topic 4, Section 17.03) so that they could present facts necessary to establish that they met the criteria for a variation. (Topic 4, Section 17.04.) These criteria generally concern the degree of harm posed to the applicant by a literal reading of the regulations and the compatibility of the proposed variance with the area's authorized use, in this case agriculture. If A.R.P.E. were really "looking for a loophole," as Regional Director García claimed, it could have granted such a hearing. Instead, after several months of public controversy which focussed on matters wholly unrelated to agriculture or the variation criteria, A.R.P.E. issued a "ministerial" denial of the use permit. A.R.P.E.'s claim to the effect that "its hands were tied" is belied by the very regulations on which it relies.

Finally, the evidence tends to show that the El Yunque Regulations were selectively enforced against plaintiffs. While we acknowledge that A.R.P.E. is entitled a certain degree of selectivity in enforcement, the circumstances of this case indicate that its strict application of the El Yunque Regulations was unusual. A.R.P.E. did not cite a single instance other than the hospice where a use permit has been denied as inconsistent with the El Yunque Regula-

---

**10.** We note that Regional Director García, who was present in court during Serrano's testimony, did not attempt to contradict Serrano's version of his meetings with A.R.P.E. officials.

**11.** The possibility of flooding was raised several times throughout this controversy, but no evidence of the land's flood-prone nature was presented to this court and A.R.P.E. does not herein allege flooding as a basis for denying the permit.

**12.** The court also notes, by way of demeanor evidence, that Regional Director García grew visibly nervous at the prospect of being impeached through the use of video tapes of his prior televised statements. García testified on a Friday and the tapes were viewed in open court the following Monday. Although the court requested that García be present during the viewing of the video tapes so as to clarify the accuracy and context of the statements made therein, García failed to appear.

tions.[13] Plaintiffs, however, presented uncontradicted evidence that A.R.P.E. at the very least has acquiesced to numerous zoning violations in the Luquillo area since the El Yunque Regulations took effect. This evidence, furthermore, was confirmed by the court during an on-site inspection. All indications point to the conclusion that the A–1 zoning regulation was strictly and selectively enforced against plaintiffs.

Given the foregoing, we conclude that, far from looking for a loophole to help plaintiffs, A.R.P.E. was looking for an excuse to deny the permit. When flooding or contagion proved insufficient reasons for denial, A.R.P.E. dusted off the El Yunque Regulations. It did so with the intent to prevent AIDS patients from residing in the Luquillo area and thereby ward off public opposition from the area residents. *Baxter, supra.*

### 2. Disparate Impact

■ We also find that plaintiffs have sufficiently demonstrated discrimination under the "disparate impact" test. The most often cited formulation of disparate impact analysis comes from the Seventh Circuit in *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977). There, in a case alleging racial discrimination, the court established a four-pronged analysis for evaluating facially-neutral conduct that produced a discriminatory effect but was taken with little or no discriminatory intent. The pertinent factors are: (1) the strength of plaintiff's showing of discriminatory effect; (2) whether there is some evidence of discriminatory intent; (3) defendant's professed interest in taking the action complained of; and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of a protected class or merely seeks to restrain the defendant from interfering with individual property owners wishing to provide such housing. *Id.* at 1290.

■ With respect to the first prong, "[i]t is evident that the actions of [A.R.P.E.]

adversely impacted handicapped individuals, persons who are HIV-positive, more than non-handicapped individuals." *Baxter*, 720 F.Supp. at 732. Due to the fact that the permit was denied, A.F.A.P.S. has been unable to go forward with its plans to open the hospice and the remaining plaintiffs, all AIDS patients and protected under the Fair Housing Act, have been denied a place to live. All plaintiffs have "been adversely impacted each day the residence remains unopened." *Id.* The court therefore finds strong evidence of discriminatory effect.

The second prong evaluates whether plaintiffs have produced at least some evidence of discriminatory intent, even though the strength of such evidence does not meet that needed to establish a fourteenth amendment violation as set forth in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This criterion has been called the "least important" prong of disparate impact analysis. *Arlington Heights*, 558 F.2d at 1292; *Baxter*, 720 F.Supp. at 732; *see also Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934–36 (2nd Cir.) (holding that plaintiffs need not present *any* evidence of discriminatory intent to establish a prima facie case under disparate impact analysis), *aff'd.*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Here, we need only reiterate the conclusion that prejudice against AIDS patients significantly contributed to A.R.P.E.'s decision to deny the special use permit. *See* Part II B 1, *supra.*

The third prong takes into account the strength of the purported interest of the defendant in taking the action which produced a discriminatory effect. In this case, A.R.P.E. argues that it acted pursuant to its interest in enforcing zoning regulations and in furtherance of the policies underlying the El Yunque Regulations. As in *Baxter*, however, "[t]he Court acknowledges the [defendants'] stated concerns, but finds them to have been a pretext" for reasons already stated. *Baxter*, 720

---

**13.** To the contrary, Regional Director García, in response to a question posed by the court, testified that numerous fast-food restaurants near Luquillo Beach have been granted provisional use permits, which are considered variations under A.R.P.E. regulations.

F.Supp. at 733. That aside, A.R.P.E., both during the permit issuing process and at trial, failed to present any substantial evidence as to why the presence of a hospice would impair significant interests sought to be advanced by the El Yunque Regulations and simply relied on the existence of the cited zoning ordinance. *Cf. Huntington Branch, NAACP v. Town of Huntington* 844 F.2d 926, 939–40 (2nd Cir.), *aff'd.*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Under disparate impact analysis the defendant is required to prove that its action furthers, "in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, NAACP,* 844 F.2d at 936. Here, aside from citing the regulation, A.R.P.E. has offered absolutely no significant evidence proving the goals of the zoning plan would be impaired by allowing ten AIDS patients to reside in an already existing structure. *Id.* at 940.

The final prong of disparate impact analysis focuses on the type of relief requested by plaintiffs. Generally, if a plaintiff is suing only to require a public defendant to eliminate some obstacle to housing that plaintiff itself will provide, rather than to compel the public defendant to build housing, defendant normally has to establish somewhat more substantial justification for its adverse action than would be required if defendant were defending its decision not to build. *Id.* at 936; *Baxter,* 720 F.Supp. at 733. Here, A.F.A.P.S. asks nothing more from the government than to let them house ten members of a handicapped group in a building that is being rented and repaired by the plaintiffs. This factor, then, also favors plaintiffs.

We hold that plaintiffs have established a violation of the Fair Housing Act under both methods of analysis. Because the court finds in favor of plaintiffs on statutory grounds, we need not address plaintiffs' claim that defendants violated their rights under the equal protection clause of the fourteenth amendment. Although we note a promising analogy between this case and *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)—where the Supreme Court held that requiring a special zoning permit for a proposed group home for mentally retarded persons violates equal protection in absence of any rational basis for believing the home poses a special threat to the city's legitimate interests— the court is restrained from going further down this road by a "judicial preference to avoid unnecessary constitutional rulings." *Baxter,* 720 F.Supp. at 734, *citing Singleton v. Wulff,* 428 U.S. 106, 124, 96 S.Ct. 2868, 2879, 49 L.Ed.2d 826 (1976).

### III. CONCLUSION

No one will deny that the AIDS epidemic, in Puerto Rico and elsewhere, has generated great cause for concern. No one can blame the residents of any town for making a priority of the health and safety of their families and community. But when legitimate concern is fanned by a profound misunderstanding of the causes of AIDS, the rush to panic can easily result in illegal and unjustifiable discrimination against not only the disease's victims but also against the laudable efforts of individuals working to contain the flames.[14] A.R.P.E., by misguidedly succumbing to community pressure, has itself become a party to such discrimination. This the Fair Housing Act does not allow.

The defendants are therefore preliminarily and permanently **ENJOINED** from refusing to issue a special use permit to A.F.A.P.S. for the operation of a hospice for up to ten terminally-ill AIDS patients at the mentioned site in the Sabana Ward of Luquillo, Puerto Rico. We note, however, although the point is not raised by defen-

---

**14.** Dr. Antonia Coello de Novello, the Surgeon General of the United States, who was born ten miles from the Luquillo area, has recently praised the "selfless thousands who have volunteered to care for persons with AIDS in hospitals, in homes, in communities throughout the U.S." She has also stated that "discrimination against persons with HIV infection and AIDS won't be tolerated" by the Bush administration. *See* "Recent Developments in Our Fight Against AIDS and HIV" in *Sidavances,* April 1990.

dants, that section 3602(h) specifically excludes illegal drug users from the definition of "handicap" under the Fair Housing Act. 42 U.S.C. § 3602(h). While there is no evidence in the record that any of the plaintiffs are currently engaging in illegal drug use, we conclude that A.R.P.E. or some other appropriate agency may, consistent with the Fair Housing Act, prevent *current* illegal drug users from residing at the A.F.A.P.S. hospice and limit the special use permit accordingly. **Within ten calendar days of this order, A.R.P.E. will submit to this court any suggested restrictions consistent with this opinion.** After evaluating these suggested restrictions, the court will enter an additional order at which time plaintiffs' use permit will be deemed granted and judgment will be entered.[15]

IT IS SO ORDERED.

---

**15.** 42 U.S.C. section 3631 provides for criminal sanctions against "[w]hoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" persons exercising rights under the Fair Housing Act. Upon conviction of a violation of 42 U.S.C. section 3631, a defendant "shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,-000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life." 42 U.S.C. section 3631.

Needless to say, this court will not tolerate violations of section 3631 from any quarter with respect to the rights of staff or residents of the A.F.A.P.S. hospice, and the United States Attorney will be directed to investigate, and, if necessary, prosecute any apparent violation.

In addition, we note that a violation of the terms of this order by defendants or third parties may be punishable by contempt, a sanction that can be as severe as that associated with criminal prosecution.