UNITED STATES of America, Plaintiff,

v.

The COMMONWEALTH OF PUERTO RICO and the Regulations and Permits Administration, a/k/a Administracion de Reglamentos Y Permisos (A.R.P.E.), Defendants.

Civ. No. 91–1486 (JAF).

United States District Court, D. Puerto Rico.

May 7, 1991.

Osvaldo Carlo–Linares, Asst. U.S. Atty., San Juan, P.R., Daniel F. López–Romo, U.S. Atty., D. Puerto Rico, David G. Lubben, Joan A. Magagna, Housing & Civ. Enforcement Section, Civ. Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Antonio Fiol–Matta, Director, Federal Litigation Div., Dept. of Justice, Commonwealth of P.R. Héctor Rivera–Cruz, Secretary of Justice, San Juan P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

Isla Verde Nursing Home is currently home to thirteen elderly individuals many or most of whom suffer from severe mental or physical handicaps. The Commonwealth of Puerto Rico's zoning agency, Administración de Reglamentos Y Permisos ("A.R.P.E."), refused to grant the nursing home's owner permission to operate the home in its present site, and ordered the home closed. When the owner refused to comply, A.R.P.E. turned to the Commonwealth courts. The Commonwealth court ordered the closure, with further noncompliance to be punished by incarceration of the nursing home owner. Meanwhile, the Secretary of Housing and Urban Development ("HUD") has been investigating this matter for possible violations of the Fair Housing Act ("FHA") on the basis of handicap. In order to allow that investigation to proceed without the threat of the home's imminent eviction from the premises, the United States seeks a preliminary injunction to stop enforcement of the A.R.P.E. decision and local court order pursuant to section 810 of the FHA, 42 U.S.C. § 3610(e). Once the investigation is complete, HUD will determine whether the complaints of illegality require further action at either the administrative or judicial level. We held a full hearing on the preliminary injunction. For the reasons stated below, we grant the relief requested.

### Facts

Irene de Varona Martínez' interest in congregate care facilities for the elderly began when she visited relatives in a nursing home in Miami where she found conditions to be inhuman. She had her grandmother transferred from Miami to a nursing home in the Hato Rey section of San Juan. She became more and more involved with the home in Hato Rey, and eventually became its director. The Hato Rey home had a permanent A.R.P.E. license to operate.

In 1989 the home was obligated to move when the owner of the house in which it operated decided to put the property to other use. After much searching, Ms. de Varona leased a two-story, eight-bedroom residence at 78 Venus Street, in the Atlantic View neighborhood. The site was perfect for the needs of the home, since it was near a supermarket, a pharmacy, and a church.

Ms. de Varona testified that at the time of the move she did not believe that a new A.R.P.E. permit was needed, since she thought the permit was for the operation of the home itself, and was not location specific. Shortly after the move, however, an A.R.P.E. investigator came to the home, and informed Ms. de Varona that she would need a permit to operate. Although the area in question is zoned R–3 (RT–3), residential, the zoning laws specifically require that nursing homes be granted permits to operate by making a special application to A.R.P.E. for a variance. De Varona made the application.

### Hearing and Aftermath

Opposition to the home among the Atlantic View neighbors was strong. At the A.R.P.E. hearing held on the variance, neighbor Annette López de Méndez, president of the neighborhood association, testified that the home was "not needed for our community" and that it would bring an increase of cars, strangers, and eventually lower property values. She expressed concern that the home bordered a school. She thought that the home was not an adequate facility because the elderly need recreation areas. It bothered her to see the elders in wheelchairs sitting in the garage area in the afternoon. It came out that although

the neighborhood is zoned R–3, there are many non-conforming uses, such as the school, supermarket, and a fish store/restaurant complex.

Neighbor Carmin Juliá Roger Viuda de Torres testified that it was not an adequate place, because "that's a house for a family." She spoke about an increase in garbage from the home. She talked about how the children at the school might bother the elderly, and that the elderly "need silence." She was concerned because she saw the elderly sitting outside on a balcony in the afternoon when the sun was very hot. She stated that every three to four months sewer or runoff water backed up and flowed from a property adjacent to the home into the street in front of the home, and that such an occurrence could cause problems to the elderly residents. Although she admitted that the effluent also flowed in front of her own house, and that it also bothered her, she opined that it would bother the home's residents more since they were even older than she. Finally, she expressed concern that flies or rats attracted by the garbage in front of the fish store might cross the street and go to the home, which would be dangerous to the home's residents.

· After the hearing, A.R.P.E. rejected the petition for a use permit. The relevant section of the A.R.P.E. decision reads as follows:

> At the hearing, the opponents stated that the facilities were not appropriate for the use since the area was saturated by commercial use and they understand this use to devaluate the surrounding properties. Use by exception is mentioned in the conclusions of law. It has only one parking space and according to the spaces required, as per Section 70.04 where one (1) for every fifteen (15) square meters is required, it would need more than ten (10).

The parking requirement which was applied is that applicable to a business establishment. No other reasons were given for the denial. Testimony at the hearing before this court established that none of the residents own cars, that none of the staff of the home drove to work with the exception of the owner herself, and that visits to the thirteen residents by family or friends were very rare. In short, the home generates no more need for parking than an average family living in the same house would have.[1]

Armed with the hearing officer's order, A.R.P.E. then proceeded to the District Court of the Commonwealth of Puerto Rico, Carolina Part, alleging that de Varona was operating without an A.R.P.E. permit in violation of Law No. 76 of June 24, 1975 (23 L.P.R.A. §§ 71a *et seq.*) The district court granted a temporary injunction, and on October 5, 1989 permanently enjoined de Varona from operating the home.

### Testimony Before This Court

Ms. Villanueva, a wheelchair-bound resident of the home suffering from muscular dystrophy, testified to the loving care that was afforded at the home, and her fear that being put out would leave her nowhere to go. She expressed fear about being forced to a home where mistreatment of patients occurs.

A Puerto Rico Department of Social Services (DSS) representative with personal knowledge of the Isla Verde home testified that the home would need a license from DSS to operate, but that DSS could not issue the license until an A.R.P.E. permit had been granted. Although the representative testified about some small irregularities in the home which would need to be corrected for DSS approval (such as moving a cupboard further from the laundry room, and designating one of the bedrooms as a special "isolation" area for ill patients

---

1. The A.R.P.E. hearing officer testified before this court. He said the decision was based on a Department of Social Services regulation which would define this home as a "health house" which would require special licensing. It is hard to see this as anything other than a blatant lie. The hearing officer's written decision makes no mention of the "health house" issue, and the DSS representative testified that DSS was fully satisfied that the home was in substantial compliance with all applicable DSS regulations. This court finds A.R.P.E.'s facially-transparent attempt to manufacture a basis for its decision unconvincing.

awaiting transfer to a hospital) she concluded that the home could receive DSS approval with relative ease. The representative spoke about the need for long-term care centers for the elderly in Puerto Rico, and about DSS' interest in seeing such homes remain in operation. She testified that DSS would not hesitate to close a home where abuse, neglect, or threat of abuse or neglect of the elderly existed, but that the Isla Verde home was clearly not in that category. In short, she testified that but for the hold up in the A.R.P.E. permit, DSS would move ahead to license the home.

Ms. Johnson, an investigator from HUD, reported the results of her investigation to date. She described the various physical and mental handicaps that the residents of the home suffered from, the opposition by neighbors which she encountered, and the position of government officials. She concluded that the opposition by the neighbors was due more to animus against the residents because of their handicaps than for any actual disruption in the neighborhood caused by the home. Ms. Johnson detailed her plans to finish the investigation, including the review of documents that she had requested from A.R.P.E. but which had not yet been supplied. She said that the results of her investigation would be forwarded to Washington where the final decision as to how HUD should proceed would be reached. Ms. Johnson testified that the preliminary injunction is necessary for the Department because any investigation would be greatly hampered were the residents in the home to be evicted and dispersed to other locations, not to mention the effect on those individuals.

### The Act

■ The Fair Housing Act creates "an elaborate administrative enforcement mechanism" to resolve complaints by individuals who allege threat they have been subjected to illegal discrimination. *Secretary, United States Dept. of Housing & Urban Development v. Blackwell,* 908 F.2d 864, 869 (11th Cir.1990). Upon receiving a complaint, the Secretary is to conduct an investigation. 42 U.S.C.

§ 3610(a)(1)(B)(iv). In this case, complaints were filed by a resident of the home, Ms. Villanueva, and the owner, Ms. de Varona.

Section 804(f) of the Fair Housing Act, 42 U.S.C. § 3604(f), makes it unlawful:

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

> \*      \*      \*      \*      \*      \*

> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available....

"Handicap" is defined in the statute to include:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

> (2) a record of having such an impairment, or

> (3) being regarded as having such an impairment.

The statute also makes it illegal to refuse on the basis of handicap to:

> [m]ake reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

The United States filed this action under 42 U.S.C. § 3610(e), which provides as follows:

> (e) Prompt Judicial Action.—(1) If the Secretary concludes at any time following the filing of a complaint that prompt judicial action is necessary to carry out the purposes of this title, the Secretary may authorize a civil action for appropriate temporary or preliminary relief pending final disposition of the complaint under this section. Upon receipt of such authorization, the Attorney General shall promptly commence and maintain such an action. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with the Federal Rules of Civil Procedure. The commencement of a civil action under this subsection does not affect the initiation or continuation of

administrative proceedings under this section and section 812 of this title.

Drawing from the substantive provisions of the Act, then, the theory of the United States can be summarized. There is a high likelihood to believe that the decision by A.R.P.E. not to issue a use permit to the home was based on pressure from neighbors whose real concern is a distaste for or fear of the handicapped. The only rule cited by the A.R.P.E. decision against the granting of the permit is the ten-space parking rule. Even if that rule does apply to this case, the "reasonable accommodation" provision would require A.R.P.E. to waive the parking requirement in this case where the actual use of the home will never necessitate the provision of the amount of parking technically required by the rule. Finally, since there is solid evidence of illegal discrimination, and the imminent threat that individuals protected under the Act will lose the subject housing before the Secretary can complete an investigation of the complaints filed, a preliminary injunction should issue.

Analyzed under the First Circuit's standard for a preliminary injunction, *Planned Parenthood, etc. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981), we must look to the following four factors:

1) Irreparable harm to the plaintiff without the injunction;

2) the harm that an injunction would cause the party enjoined;

3) the plaintiff's likelihood of success on the merits;

4) the public interest.

Although resident Villanueva is not technically a plaintiff, since the suit is brought in the name of the United States, we look to her as one of the real parties in interest who will be harmed if no injunction is issued. The harm to Ms. Villanueva from losing a loving, caring home, considering the current emergency lack of adequate elder care facilities in Puerto Rico, is manifest. This court viewed first hand Ms. Villanueva's brave and feisty defense of her home, but her physical vulnerability was apparent. Eviction would be devastating. Plaintiff easily meets its burden on element one.

The harm to the defendant agency and Commonwealth is abstract and minimal. The home has operated without serious incident for a substantial period. If it is ultimately proven that the allegations by HUD are without foundation, the eviction of the elderly and the removal of the home from the site can proceed unimpeded. While we understand that the state's interest in rapidly enforcing its agency's orders is real, we are certain that Puerto Rico has an equally strong interest in affording all citizens full protection of the civil rights laws. Since both A.R.P.E. officials who testified admitted that they did not consider the Fair Housing Act in dealing with this situation, we see a countervailing Commonwealth interest in seeing that such an inquiry is adequately made. We see that this countervailing interest substantially dilutes any pro-enforcement interest that the Commonwealth might have, reducing the potential "harm" to be suffered by the Commonwealth.

As to the likelihood of success on the merits, we believe plaintiff has more than sufficiently raised the spectre of illegal discrimination. The review of the A.R.P.E. hearing tapes revealed many of the recurrent myths and irrational attitudes held about the elderly handicapped that lead to discrimination against them. Fear that school children would bother the elderly, or that garbage from the fish store, a nuisance for everyone, would be particularly intolerable to the elderly handicapped came across as feeble attempts to justify what became clear in the testimony: that these neighbors did not like to have a group of elder individuals in wheelchairs sharing their neighborhood. The A.R.P.E. justification for the decision, the application of a technical parking space rule to a home with no more need for parking than a private residence, seems a clear violation of the "reasonable accommodation" section of the statute. In short, defendants produced no evidence whatsoever that tended to disprove plaintiff's case. We think that it is highly likely, were this matter to go to trial at some point in the future, that the illegal discrimination would be proven.

The testimony of the Department of Social Services representative with respect to the acute lack of and need for facilities like this one in Puerto Rico would be sufficient, on its own, for us to find that the public interest weighs in favor of the injunction. We must add also the public interest that all citizens have in seeing vigorous enforcement of civil rights legislation like the Fair Housing Act. Examples of the kind of discrimination prohibited by the Act are all too common in Puerto Rico. *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 752 F.Supp. 1152 (D.P.R.1990); *Association of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Regulations and Permits Administration (A.R.P.E.),* 740 F.Supp. 95, 102 (D.P.R.1990). Investigations like the one currently being undertaken by HUD help to shed light on the problem and to help educate officials on the need for sensitivity to these issues. The public interest weighs heavily in favor of a preliminary injunction.

### Motion to Dismiss

Though we find that all the standards for a preliminary injunction are reached, defendants raise three legal obstacles to plaintiff's quest for relief which we take up in order. Defendants argue that the matter is barred by the doctrine of *res judicata,* that the federal court should abstain, and that we have no power to grant the requested injunction due to the bar set up in the Anti–Injunction Act.

### Res Judicata

Defendants argue that since Ms. de Varona was a party-defendant in the Commonwealth action to enforce the A.R.P.E. decision, the lawsuit before us is barred by *res judicata.* This argument fails to account for the fact that resident Villanueva's interests, brought to this court through the Justice Department in response to a request by HUD prompted by Ms. Villanueva's complaint to that agency, can in no way be barred by the prior action. She was not a party to those proceedings, and need not have been in order to independently claim her rights here. *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 752 F.Supp. 1152 (D.P.R.1990). A federal district court must give the same preclusive effect to state court judgments as should be given those same judgments in local courts. 28 U.S.C. § 1738 (Full Faith and Credit); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Article 1204 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3343, the local *res judicata* provision, requires the "most perfect identity of things, causes, and parties" for *res judicata* effect to apply. *Futura Development Corp. v. Centex Corp.,* 761 F.2d 33, 42–46 (1st Cir.); *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 121 (1985); *Casa Marie,* 752 F.Supp. at 1162. The parties in the matter before us are different, and the interests at stake are different. In addition, Puerto Rico *res judicata* doctrine contains an "ends of justice" exception which allows a court to refuse to bar an action on the grounds of *res judicata* where to do so would work a substantial injustice. *Casa Marie,* 752 F.Supp. at 1163. We believe that the interests of Villanueva alone can justify our finding this matter not to be subject to a *res judicata* bar, and we base our holding on that ground.

The United States also argues that it, as a litigant separate from Ms. de Varona, has a claim that cannot be identified directly with her claim, and implicates different interests (her interest in operating the home, HUD's interest in eradicating discrimination). While these arguments might have merit, we need not reach them.

Finally, the United States argues that Ms. de Varona herself would not be barred by the doctrine of *res judicata* even if she brought this federal action independently. An attorney testified at the hearing before us that in the Commonwealth court the Fair Housing Act issues were raised orally to the Commonwealth judge only at the hearing on contempt, after a valid Commonwealth court order had already issued. We take no position on whether Ms. de Varona would have been barred from bringing an independent action, nor whether the United States would have been barred had they appeared only on her behalf. Although the application of Puerto Rico's *res judicata* doctrine leaves a court broad discretion not to find a *res judicata* bar, since the Puerto Rico statute is rela-

**226**

tively kind to subsequent claims, there must be some point at which the failure to raise federal claims properly and timely in the Commonwealth courts has its consequences. We note that although the injunction we issue today will provide Ms. de Varona with incidental relief, that is a consequence of the fact that the only way to protect the rights of the elderly handicapped is through protection of the continued operation of the home.

### Abstention

■ A party arguing for abstention must show circumstances so extraordinary as to overcome "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Defendants raise the abstention doctrines of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The *Burford* doctrine is concerned with "protecting complex state administrative processes from undue federal interference," *New Orleans Public Service Inc. v. City Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). It is appropriate where the ongoing state court proceedings present important questions of state law which reflect important state concerns. Here there are no complex state law questions which must be answered, and no complex state created administrative policies which the state is trying to define or streamline, nor which would be disrupted by federal court intervention. Abstention is "particularly inappropriate in civil rights cases brought to enforce federally protected rights." *Association of Relatives and Friends of AIDS Patients (A.F. A.P.S.) v. Regulations and Permits Administration (A.R.P.E.)*, 740 F.Supp. 95, 102 (D.P.R.1990). In *A.F.A.P.S.*, this court refused to abstain where plaintiffs challenged A.R.P.E.'s denial of plaintiff's application for a special use permit to open an AIDS hospice in circumstances very similar to the ones at issue here. *See Casa Marie*, 752 F.Supp. at 1163.

■ *Younger* held that pending state court criminal proceedings should not be enjoined by federal courts. The holding has been extended to certain types of civil proceedings. *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Abstention has been applied particularly when the state court's contempt proceedings are involved. *Juidice v. Vail*, 430 U.S. 327, 334–36, 97 S.Ct. 1211, 1216–18, 51 L.Ed.2d 376 (1977); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). But the rule is not an absolute bar. As the *Juidice* court recognized, abstention under the doctrine is only appropriate where the federal plaintiffs had the full and fair opportunity to litigate their claims in the local courts. Here complainant Villanueva did not even appear in the local action. Secondly, *Younger* itself recognizes an exception where the potential for irreparable harm to the plaintiffs in the absence of relief will override the comity interests which ordinarily dictate a finding for abstention. *Younger*, 401 U.S. at 53, 91 S.Ct. at 755. In *Sullivan v. City of Pittsburgh, Pa.*, 811 F.2d 171 (3rd Cir. 1987), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987), the City of Pittsburgh sought to close residential treatment facilities for recovering alcoholics through an administrative proceeding. Recovering alcoholics, clients of the clinics, filed in federal court to halt the closures. The court refused to apply *Younger* (or, actually, *Ohio Civil Rights Commission v. Dayton Christian School*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), which extended *Younger* to administrative proceedings) since the federal plaintiffs were never a part of the local action, and since they stood to suffer serious irreparable harm if the clinics were closed. We see similarities to the case at bar, and we find *Younger* inapplicable for the same reasons.

### Anti–Injunction Statute

■ The anti-injunction statute, 28 U.S.C. § 2283, does not apply to suits brought by the United States. *Leiter Minerals, Inc., v. United States*, 352 U.S. 220, 225–26, 77 S.Ct. 287, 290, 1 L.Ed.2d 267 (1957):

[W]hen it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings, except under the severe restrictions of 28 U.S.C. § 2283, would be so great that we cannot reasonably impute such a purpose to Congress.

In *Mitchum v. Foster*, 407 U.S. 225, 235–36, 92 S.Ct. 2151, 2158–59, 32 L.Ed.2d 705 (1972), that doctrine was revisited as the court cited to the *Leiter* exception to the anti-injunction statute which "permits a federal injunction of state court proceedings when the plaintiff in the federal court is the United States itself, or a federal agency asserting 'superior federal interests.'"

In addition, this court has previously held that the Fair Housing Act constitutes an "expressly authorized" exception to the anti-injunction statute. *Casa Marie*, 752 F.Supp. at 1170–71.

The anti-injunction statute is no bar to the relief requested in this case.

## Conclusion

This is the third time in a year that this court has had to enjoin violations of the Fair Housing Act in Puerto Rico. *A.F.A. P.S.*, 740 F.Supp. at 95; *Casa Marie*, 752 F.Supp. at 1152. In two of the three cases this court has had to deal with the aftermath of A.R.P.E.'s sanctioning of illegal discrimination against the handicapped. In both of those cases the agency has fought enforcement of federal law and refused to consider reexamining its own actions in light of the protections granted by federal law. We understand that at times the passions of the community will have undue influence on local agency decisions which may result in violations of law. But we would expect that once such actions have been brought to the attention of agency policy makers and their legal counsel, responsible action would be the order of the day. We can see no defensible reason why the agency, charged with the administration of its tasks within the confines of law, would not admit its error, and get on with the business of setting things right. Government agencies, like individuals, lose credibility when they tenaciously defend facially discriminatory actions.

A.R.P.E. is now on notice. This court will not tolerate violations of the federal Fair Housing Act, and will throw all its power into reversing such discrimination when it takes place. The preliminary injunction sought by the United States is hereby GRANTED. Administrative proceedings by HUD will continue. Within ninety (90) days, the government will file a status report and, if need be, will seek to supplement the pleadings, in order to bring this controversy to an end by trial on the merits or otherwise. Fed.R.Civ.P. 15(d). Extensions to the ninety-day period will be granted only for good cause shown. If no efficient action is taken by the United States within that time, defendants may move to dissolve the preliminary injunction.

IT IS SO ORDERED.