**POTOMAC GROUP HOME CORPORATION; Betty Neuhaus, by her daughter and next friend, Jo–Ann Neuhaus; and Ruth Stokoe, by her husband and next friend, William Stokoe, Plaintiffs,**

v.

**MONTGOMERY COUNTY, MARYLAND; Montgomery County Department of Health; Harold J. Gabel; Robert Carty; and Alicia Beach, Defendants.**

Civ. No. H–92–1192.

United States District Court,
D. Maryland.

June 14, 1993.

Andrew D. Levy, Therese L. Staudenmaier and Brown, Goldstein & Levy, Baltimore, MD, for plaintiff Potomac Group Home Corp.

Beth Pepper and the Mental Health Law Project, Washington, DC, for plaintiffs Neuhaus and Stokoe.

Sharon V. Burrell, Asst. County Atty., for Montgomery County, Rockville, MD, for defendants.

Charles W. Logan and Covington & Burling, Washington, DC, and James F. Rosner and Whiteford, Taylor & Preston, Towson, MD, for amici curiae.

ALEXANDER HARVEY, II, Senior District Judge.

Presently pending in this civil action are the parties' cross motions for summary judgment or for partial summary judgment. Plaintiff Potomac Group Home Corporation (hereinafter "Potomac") operates four group homes [1] in Maryland which provide housing for and services to elderly persons who require some assistance with their daily living activities. Plaintiffs Betty Neuhaus and Ruth Stokoe are residents at Golden Guardian, one of the group homes operated by Potomac. The defendants are Montgomery County, Maryland, the Montgomery County Department of Health, and certain individuals employed by the County's Department of Health.

The amended complaint in this case contains four counts and seeks declaratory and injunctive relief as well as monetary damages under the Fair Housing Amendments Act of 1988 (hereinafter the "FHAA"), Pub.L. No. 100–430, 102 Stat. 1619, *codified at* 42 U.S.C. § 3601, *et seq.*, and under the Americans with Disabilities Act of 1990 (hereinafter the "ADA"), 42 U.S.C. § 12101, *et seq.* Counts I and II of the amended complaint allege that certain provisions of the Montgomery County Code (hereinafter the "Code") violate plaintiffs' rights under the FHAA. Count I alleges on behalf of each plaintiff that the "exceptional person" definition contained in the Code, on its face and as applied here, violates the FHAA. Count II alleges that the neighbor notification and program review board provisions of the Code violate plaintiffs' rights under the FHAA. Count III alleges on behalf of plaintiffs Neuhaus and Stokoe that the "exceptional person" definition con-

---

1. These group homes are known as Simeon's House, Golden Guardian, Pepper's House and Andrus House.

tained in the Code violates the ADA. Count IV alleges that certain actions undertaken by defendants since the filing of this lawsuit constitute unlawful harassment and retaliation in violation of the FHAA.

Two motions for a preliminary injunction have previously been filed in this case. The first motion for a preliminary injunction was filed by plaintiffs on April 28, 1992, the same day that this lawsuit was instituted. That motion sought to enjoin defendants from enforcing the provisions of Chapter 23A of the Code against the two individual plaintiffs in this case, Betty Neuhaus and Ruth Stokoe. Under Chapter 23A, only individuals meeting the statutory definition of an "exceptional person" are permitted to live in group homes. Defendants contend that neither plaintiff Neuhaus nor plaintiff Stokoe, because of their mental and physical qualifications, can qualify as an "exceptional person." Prior to the filing of this suit, Montgomery County had ordered that Neuhaus and Stokoe be evicted from Golden Guardian. With its complaint, plaintiffs filed a motion for a temporary restraining order and a motion for a preliminary injunction, seeking to block the eviction of plaintiffs Neuhaus and Stokoe. However, in a conference with the Court, the Montgomery County defendants agreed to stipulate that Stokoe and Neuhaus could remain at Golden Guardian pending the outcome of this case.

On June 8, 1992, plaintiff Potomac filed a second motion for a preliminary injunction. By way of this motion, plaintiff Potomac sought an order prohibiting defendants from retaliating against it and further sought to enjoin enforcement of certain provisions of Chapter 23A of the Code. Following a preliminary hearing, the issues raised by the second motion for a preliminary injunction were amicably resolved by the parties, and on October 1, 1992, the Court approved a Stipulation withdrawing the second motion. Under the terms of the Stipulation, Mont-

gomery County agreed to promptly convene a program review board for Pepper House without neighbor participation, to waive neighbor notification for Andrus House, and to review the program statement submitted for Andrus House without the holding of a program review board hearing. Pepper House and Andrus House have subsequently been licensed and are presently operating in Montgomery County.

By way of their pending motion for partial summary judgment, plaintiffs are seeking summary judgment as to liability on Counts I, II and III. Plaintiffs' motion does not address the claim of plaintiff Potomac in Count IV that defendants retaliated against it for filing this lawsuit, nor do plaintiffs seek summary judgment at this time concerning any damages or injunctive relief to which they might be entitled. Defendants' motion seeks the entry of summary judgment in their favor as to each of Counts I through IV.

Memoranda, and numerous depositions, affidavits and exhibits in support of and in opposition to the pending motions have been submitted by the parties and reviewed by the Court. The Court has also received and reviewed memoranda submitted by *amici curiae*.[2] Oral argument has been heard in open Court. For the reasons to be stated herein, plaintiffs' motion for partial summary judgment will be granted in part and denied in part, and defendants' motion for summary judgment will be denied.

I

*Background and Facts*

Potomac is a Maryland corporation which provides community-based housing and support services to elderly people in Montgomery County, Maryland. Since 1989, Potomac has opened four group homes in Montgomery County: Simeon's House, licensed on January 15, 1991; Golden Guardian, licensed on April 4, 1991; Pepper's House, licensed on

---

**2.** Two *amici* memoranda have been filed in this case. One memorandum was filed on behalf of eight organizations: the American Civil Liberties Union of Maryland, the American Civil Liberties Union of the North Capital Area, the Alzheimer's Association, the American Association of Retired Persons, Key Point Incorporated, the Maryland

Disability Law Center, Inc., the National Association of Private Residential Resources, and ReVisions, Inc. The second memorandum was filed on behalf of two organizations: the Arc of Maryland, Inc. and the Maryland Association of Psychiatric Support Services.

November 4, 1992; and Andrus House, licensed on November 9, 1992. Eight persons are housed in a comfortable community setting in each of these group homes. At least two employees of Potomac staff each home during the day, and one employee of Potomac staffs each home at night. Staff personnel assist the residents with their everyday needs, such as bathing, grooming and eating. The physical and mental condition of the residents is such that they do not require a skilled nurse to assist them with their daily needs. Potomac's group homes thus provide elderly persons in Montgomery County with the opportunity to live in home-like milieus instead of in more institutionalized nursing homes. Defendants have conceded that "group homes provide an important service to Montgomery County's senior citizens by preventing premature institutionalization."

Montgomery County's licensing scheme for group homes is found in Chapter 23A of the Code and in Montgomery County Executive Regulations, 59–91 (hereinafter "ER 59–91" or the "Regulations"), § III(A)(1). Defendant Harold Gabel is the Director of the Department of Health (the "Department") and has the overall responsibility for the licensing and regulation of group homes. Defendant Robert Carty is the Director of the Department's Division of Licensure and Regulation (the "Division") and is responsible for the Division and its employees, including Linda Warren and Alicia Beach. Linda Warren is the licensing coordinator for all group homes except for the elderly. Defendant Beach is the Division's coordinator for group homes for the elderly, and is responsible for monitoring compliance by group homes with the licensing code. The Division has the responsibility for implementing and enforcing Chapter 23A of the Code and also ER 59–91.

In its zoning and land use regulations, Montgomery County does not differentiate between group homes for the elderly and any other single-family dwelling. Under County land use law, group homes for eight or fewer frail elderly residents are "permitted uses" in all residential zones in the County. Accordingly, insofar as the County's zoning laws are concerned, group homes may locate in residential areas as a matter of right, without seeking the approval of zoning officials through the special exception process or otherwise.

Notwithstanding the fact that group homes are permitted by County zoning law, Montgomery County licensing laws require group home providers to send letters to each neighboring property owner of a proposed group home site, both adjacent and opposite, as well as to neighborhood civic organizations. In these letters, the provider is required to notify these individuals and groups of its plans to operate a group home on the site. ER 59–91, § 4A(1)(a). Pursuant to the Regulations, Potomac has been required to provide neighbors and civic groups with a variety of information about the proposed group home including (1) the type of group home planned, (2) an identification of the type of "exceptional person" who will live there, and (3) the name of a contact person within the County Department of Health to whom questions or complaints about the proposed group home may be addressed. The Regulations require that these notices be sent to neighbors at the time of the submission of the initial license application and at the time of each request for an annual renewal. ER 59–91, § 4(A)(1)(a), (b). No other County law or regulation imposes any similar requirement on a residence to be occupied by adult persons who do not have disabilities.

The preamble to the County's group home licensing law states:

An opportunity must be provided for residents of the neighborhood surrounding the proposed group residential care facility to comment on the proposed use and provide continuing input to responsible county agencies *regarding the compatibility of the group residential care facility within the neighborhood.* (emphasis added).

Code, § 23A–1(g).

Thus, even though zoning law defines group homes as permitted uses in residential neighborhoods, Chapter 23A invites neighbors to provide "continuing input" concerning the "compatibility" of the homes within the neighborhoods where they locate.

As the record here indicates, the notices provided by Potomac for its four group homes have consistently provoked negative reactions from neighbors of the proposed group homes. Neighbors in the communities have typically responded with an outpouring of hostility vented by way of a letter writing campaign opposing the proposed group home. For example, one neighborhood petition opposing the licensing of Simeon's House expressed the fear that the group home would lead to the "demise" of their "refined neighborhood" and to the lowering of property values.

The licensing process also requires that group homes in Montgomery County be subject on occasion to evaluation by a program review board. Program review boards are "boards which are convened on an ad hoc basis with a rotating membership to consider a specific program application." Code, § 23A–4. The function of a program review board is to "review and evaluat[e] the program statement submitted with all applications for a [group home] license prior to the issuance of any such license and to provide the director [of the Department of Health] with its recommendations." Code, § 23A–10(c).

As was repeatedly emphasized in the deposition testimony of County licensing officials, program review boards are supposed to confine their reviews strictly to "programmatic concerns." As defendant Carty testified, zoning issues, such as traffic, parking and the "character of the neighborhood," are not appropriate subjects for inquiry by a program review board, since group homes for no more than eight elderly residents are permitted uses in residential neighborhoods under the County zoning law.

Program review boards are comprised of seven to nine members who are to be (1) representatives of government agencies involved with the group residential care program under consideration, and (2) representatives of civic and charitable organizations which are interested in care to elderly members of such group homes. Code, § 23A–10(a). In addition, the Code provides that "[w]hen an application affects a municipality or a neighborhood civic organization, the board shall also include representatives therefrom." Id. Defendants have construed applicable provisions of Chapter 23A as giving neighborhood associations the right to designate one representative of each board.

Defendant Carty testified that members of each program review board should be selected based on their knowledge of "the particular population to be served" in order to provide the County with "the benefit of a body of expertise in evaluating the services that some prospective licensee was proposing." Nevertheless, the neighbors selected to serve on review boards are not required to have any professional expertise with respect to the programs and services offered by the group homes. As a result, hearings of program review boards have focussed on such nonprogrammatic concerns as "community relations," the compatibility of the group homes with the surrounding neighborhood, the impact of the group homes on property values, and the fears of neighbors about living near people with disabilities.

Neighborhood residents and civic organizations have regularly been invited to attend hearings of program review boards and, on occasion, have been invited to comment on any matter of concern to them.[3] When residents of the community have been permitted to comment, their statements have uniformly been negative ones, opposing the group homes. Their comments have consistently included stereotypical views of the elderly and of the compatibility of the elderly in the neighborhood. Complaints have ranged from parking problems, to "troublesome wandering incidents" and other problems associated with people "in varying degrees of Alzheimer's disease."

Although § 23A–10 of the Code, on its face, requires a program review board hearing in all cases except where "a review has been accomplished by another agency of competent jurisdiction over the specific program considered," plaintiffs have submitted

---

**3.** The record reveals that the practice of inviting community participation has been curtailed at more recent board hearings, apparently because of the concern of board members that such participation may violate the FHAA.

evidence indicating that such hearings have not in fact been required for most group homes for the elderly licensed in Montgomery County. Of the thirty currently active group homes for the elderly in Montgomery County, only five were subject to consideration at program review board hearings.[4] Plaintiff Potomac objected to a program review board hearing for Pepper House because of the delay involved and the stigma caused by the complaints of neighbors voiced during such hearings. Defendants held a program review board hearing on the Simeon's House application, and Potomac's program statement was thereafter approved. Potomac has since opened Golden Guardian, and has renewed its license for Simeon's House, without the holding of a program review board hearing. As noted by plaintiff Potomac, the hearing held on the Simeon's House application caused a six month delay, and the hearing held on the Pepper House application also caused a six month delay inasmuch as that application was otherwise complete on May 6, 1992.

Defendants concede that they have granted group home licenses without holding board hearings. Defendants Carty and Beach have testified that Dena White, a Division employee, acts as the other "agency of competent jurisdiction," whose "sign off" as the local agent of the State Office on Aging eliminates the need for a program review board. Ms. White, however, has testified that the decision of Ms. Beach to hold a program review board hearing determines whether Ms. White will sign off on a provider's program statement.

Evidence of record in this case reveals that program review board hearings are held, not when there is no sign off by an "agency of competent jurisdiction," but whenever neighbors of a group home are particularly vocal in their opposition to the proposed home. As Ms. White testified: "[I]f we are getting a lot of calls from neighbors who are concerned, who are writing the County Executive and County Council and there is a lot of community response ... then Alicia [Beach] will opt to have a program review board."

Another licensing requirement of the Code is that only an "exceptional person" may live in a group home. ER 59–91(II)(C). The County has sought to evict plaintiffs Neuhaus and Stokoe from Golden Guardian on the ground that they are not exceptional persons.[5] Plaintiffs have in this litigation challenged the legality of the "exceptional person" definition contained in Chapter 23A.

An "exceptional person" is defined as:

Any individual who because of emotional, mental, familial or social differences has a need for supervision or assisted community living.... Such individuals shall be capable of proper judgment in taking action for self-preservation under emergency conditions and shall be mobile and capable of exiting from a building, following instructions and responding to an alarm.

Code, § 23A–4.

The "exceptional person" rule, as interpreted by both plaintiffs and defendants, requires that a resident of a group home be both physically able to exit from a group home unassisted,[6] and mentally capable of comprehending instructions. If a group home resident is not capable of exiting from the house without assistance or of responding to an alarm, then under the rule, the resident must leave the home. Both plaintiff Neuhaus and plaintiff Stokoe are not able to exit from Golden Guardian without assistance, and the County has ordered them to leave the home for that reason.

---

4. Moreover, of the approximately 140 group homes that have been licensed by Montgomery County over the past decade, fewer than ten have been the subject of program review board hearings.

5. By Order entered April 29, 1992, the Court approved counsel's Stipulation whereby defendants agreed that plaintiffs Neuhaus and Stokoe could remain at Golden Guardian pending final resolution of the issues in this case. The Stipula-

tion approved by the Court on October 1, 1992, further provided that the Pepper House program review board would not consider whether the residents of Potomac's group homes meet the Code definition of "exceptional person."

6. Group home residents must be able to walk out of the home, or, if in a wheelchair, the resident must be able to "self-transfer" by entering a wheelchair and wheeling out of the building.

Both plaintiff Neuhaus and plaintiff Stokoe have a mental disability and need assistance with activities of their daily living. The families of these plaintiffs believe that they are receiving excellent care at Golden Guardian, and that they respond well to the warm and supportive atmosphere at the home. The personal physicians of both plaintiffs have testified that these plaintiffs have received excellent care at Golden Guardian and that this group home is a proper placement for them. Defendants have produced no credible evidence contradicting the opinions of plaintiffs' physicians and families that plaintiffs Neuhaus and Stokoe are in fact receiving appropriate care in their current home. Moreover, defendants have not identified any needs of these plaintiffs which are not being met at Golden Guardian.[7]

Although the "exceptional person" rule was originally adopted to protect the residents of group homes from the dangers of fire, evidence of record indicates that defendants no longer consider this to be the purpose of the rule. Defendant Carty, testifying as the County's designee witness under Rule 30(b)(6), has stated that this is "because there are different ways that a provider can meet the requirements of the fire code." Potomac's homes in fact contain sprinklers, smoke detectors and around-the-clock staffing, all of which, as defendants concede, eliminates any fire safety concerns.

The reason the rule is still applied, according to defendant Carty, is that it is an administratively easy and convenient tool to determine who may live in a group home. However, it is undisputed that the rule does not take into account the needs of individuals in determining who may or may not live in a group home. Defendant Carty could not explain why "mobility" is the governing criteria for living in a group home or how "mobility" reflects on the appropriateness of the setting for the care or of the care being given.

The record here further indicates that the County applies the "exceptional person" rule inflexibly. Defendant Carty has testified that the rule is a "broad" and "rigid yardstick" for determining who may or may not live in a group home.

## II

### *Summary Judgment Principles*

It is well settled that a party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that such party is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.*

One of the purposes of Rule 56 is to require the opposing party, in advance of trial and after a motion for summary judgment or partial summary judgment has been filed and supported, to come forward with some minimal facts to show that there are genuine issues of fact concerning the claims or defenses asserted. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick, supra,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a party should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk & S.R.R. Co.*, 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.*, any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by

---

**7.** Defendants suggest that the test which should be applied to determine whether group home placement is proper is whether the proposed resident can "self-medicate." Defendants have submitted evidence that the staff of Golden Guardian give plaintiff Stokoe half of a baby aspirin and a vitamin in her cereal. Nevertheless, the record reveals that plaintiffs Neuhaus and Stokoe have been ordered to leave Golden Guardian, not because they cannot self-medicate, but because they cannot self-transfer.

avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson*, the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett*, the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; .... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit discussed the Supreme Court's holdings in *Anderson* and *Catrett* in *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987). Quoting *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53 Judge Wilkinson in *Felty* emphasized that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial."

Applying these standards to the motions presently before this Court, this Court has concluded that plaintiffs' motion for partial summary judgment must be granted in part and denied in part and that defendants' motion for summary judgment must be denied. The essential facts pertaining to the claims asserted by plaintiff under the FHAA are not disputed, and the Court need merely apply the applicable legal principles to the facts of record. Insofar as Counts III and IV are concerned, disputed questions of fact exist which cannot be resolved by way of a motion for summary judgment.

## III

### *Discussion*

In support of their motion for partial summary judgment, plaintiffs contend that the exceptional person, the neighbor notification and the program review board requirements of the Code and the Regulations, on their face and as applied in this case, constitute a clear violation of the FHAA and the ADA because the intent and effect of these provisions is to restrict the ability of elderly disabled persons in Montgomery County to live where they choose. Plaintiffs further contend that these particular provisions of the Code constitute illegal discrimination because they treat the elderly handicapped differently from other similarly situated individuals who live in group homes and because they subject the residents of Potomac's group homes to public scrutiny simply because they are disabled.

In many respects, defendants, in opposing plaintiffs' motion, have in effect abandoned their efforts to uphold some of the challenged

provisions of the County licensing law. Defendants assert that proposed amendments to Chapter 23A would correct any problems that exist, and they maintain that the exceptional person and neighbor notification rules no longer mean what they once meant and still say. According to defendants, the neighbor notification and program review board procedures do not cause any harm to Potomac. Defendants further argue that, although neighbors participate in the licensing process, neighborhood opposition does not in any way affect defendants' decision whether or not to grant a license.

(a)

*The Fair Housing Amendments Act*

The Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, 102 Stat. 1619, *codified at* 42 U.S.C. § 3601, *et seq.*, extended the protection of the federal fair housing law to persons with disabilities. The FHAA, which became effective March 12, 1989, prohibits discrimination on the basis of a physical or mental handicap. 42 U.S.C. § 3604(f)(1).

Section 3604(f)(1) of the FHAA makes it unlawful

> [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter;
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.

Similarly, it is unlawful to discriminate against any person in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that person." 42 U.S.C. § 3604(f)(2).

The FHAA also makes it unlawful to coerce, intimidate, or retaliate against someone for having exercised rights protected by the FHAA. 42 U.S.C. § 3617. Furthermore, the FHAA requires defendants to make "reasonable accommodations in rules, policies, practices, or services," when such accommodations would enable a person with disabilities to live where he or she chooses. 42 U.S.C. § 3604(f)(3)(B). Courts which have considered issues arising under the FHAA have given a broad interpretation to these provisions so as to fully effectuate Congress's remedial purposes. *See, e.g., Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Admin.,* 740 F.Supp. 95, 102 (D.P.R.1990) (hereinafter *"A.F.A.P.S."*); *Baxter v. City of Belleville,* 720 F.Supp. 720, 731 (S.D.Ill.1989).

As the statute's legislative history indicates, the handicap provisions of the FHAA were intended to reach a wide array of discriminatory housing practices, including licensing laws which purport to advance the health and safety of communities:

> These new subsections [§ 3604(f) ] would also apply to state or local land use and health and safety laws, regulations, practices and decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2173, 2185.

Recognizing the purpose and breadth of provisions of the FHAA, courts have consistently invalidated a wide range of municipal licensing, zoning and other regulatory practices affecting persons with disabilities. *See, e.g., Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 47 (6th Cir.1992) (striking down discriminatory fire and safety codes); *Horizon House Developmental Services, Inc. v. Township of Upper Southampton,* 804

F.Supp. 683, 693 (E.D.Pa.1992) (striking down 1,000 foot spacing requirement); *A.F.A.P.S.*, 740 F.Supp. at 103 (enjoining refusal to issue special use permit to AIDS hospice); *Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Comm'n*, 790 F.Supp. 1197, 1219 (D.Conn.1992) (hereinafter *"McKinney Foundation"*) (invalidating special exception process).

The initial inquiries which the Court must make in this case are whether elderly residents of Potomac's group homes are "handicapped" within the meaning of § 3604(f)(1) of the FHAA and, if so, whether plaintiff Potomac has standing here to assert the rights of those residents. Defendants concede, as they should, both of these points. Elderly group home residents are clearly "handicapped" within the meaning of the FHAA. *United States v. Commonwealth of Puerto Rico*, 764 F.Supp. 220 (D.P.R.1991); *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 752 F.Supp. 1152, 1168 (D.P.R.1990). Moreover, this Court is satisfied that plaintiff Potomac has standing under § 3604(f)(1)(B) to assert the rights of those elderly residents. *Baxter*, 720 F.Supp. at 730.

A plaintiff may demonstrate a violation of the FHAA by showing that a challenged regulation "discriminates against the handicap[ped] on its face and serves no legitimate government interest." *Horizon House*, 804 F.Supp. at 693.[8] Alternatively, a plaintiff may prevail under the FHAA by showing "discriminatory intent," or by showing a "discriminatory impact." *A.F.A.P.S.*, 740 F.Supp. at 103.

Intentional discrimination or "disparate treatment" is the "most easily understood type of discrimination." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 334, n. 15, 97 S.Ct. 1843, 1854, 1854 n. 15, 52 L.Ed.2d 396 (1977). To prove discriminatory intent, a "plaintiff need only show that the handicap of the potential residents [of a group home], a protected group under the FHA, was in some part the basis for" the policy being challenged. *Baxter*, 720 F.Supp. at 732. Simply put, the inquiry un-

der a disparate treatment analysis is whether similarly situated persons or groups are subject to differential treatment. *McKinney Foundation*, 790 F.Supp. at 1211.

An ostensibly benign justification for a challenged rule or regulation is irrelevant under a disparate treatment analysis. *International Union, United Automobile, Aerospace and Agricultural Workers of America v. Johnson Controls, Inc.*, 499 U.S. 187, ——, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991). Thus, a plaintiff need not prove that a defendant was motivated by malice or prejudice in order to prevail on a claim of intentional discrimination. *McKinney Foundation*, 790 F.Supp. at 1211; *Horizon House*, 804 F.Supp. at 696.

Even if the plaintiffs were not able to demonstrate that regulations and practices of the defendants have a discriminatory intent, plaintiffs would still be entitled to establish a violation of the FHAA by showing that the regulations and practices in question have a discriminatory effect. *Casa Marie, Inc.*, 752 F.Supp. at 1168. Although the Fourth Circuit has not to date had before it any case arising under the FHAA, it is apparent that the test in the Fourth Circuit for determining whether a housing practice has a disparate impact in violation of federal law focusses on four factors:

(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide housing.

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir.1982) (applying discriminatory effect test in case arising under the Fair

**8.** The Court in *Horizon House* also noted that the legitimate government purpose requirement is "a higher level of scrutiny than [the] rational basis test applied to an equal protection analysis." *Id.* 804 F.Supp. at 695 n. 6.

Housing Act). Several courts have observed that the intent component of the above test is "the least important" and that "the absence of such proof weighs only slightly against granting relief." *Cason v. Rochester Housing Authority*, 748 F.Supp. 1002, 1008 (W.D.N.Y.1990). *See also Baxter*, 720 F.Supp. at 732.

■ Once the plaintiffs have made a *prima facie* showing of disparate impact under the above standards, the burden shifts to defendants to present proof to avoid liability. *McKinney Foundation*, 790 F.Supp. at 1220. Defendants must then present bona fide and legitimate justifications for their action and must show that no less discriminatory alternatives are available. *Id.; Cason*, 748 F.Supp. at 1007; *Horizon House*, 804 F.Supp. at 698. A regulation will not stand if it is overbroad for the asserted purpose. *Marbrunak*, 974 F.2d at 48; *Horizon House*, 804 F.Supp. at 698.

### (b)

### *Neighbor Notification*

■ The Court will first address the legality under the FHAA of the neighbor notification requirement. This requirement on its face creates an explicit classification based upon disability and is not supported by any justification of the County. It therefore contravenes § 3604(f)(1) of the FHAA. The requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is not imposed upon any family residential unit nor on any other properly zoned residential unit in the County besides group homes for the disabled.[9] As

such, it is facially invalid, unless supported by a legitimate governmental interest. *Horizon House*, 804 F.Supp. at 693–94.

On the record here, this Court concludes that no rational basis or legitimate governmental interest supports the neighbor notification requirement. Defendants argue that the regulation is not intended to harm any one and that "[t]he purpose of the neighbor notification requirement is to notify the community of the existence of the home so that the home can eventually become a part of the community." Even if there were support in the record for this assertion, a purportedly benign purpose of a facially discriminating ordinance is irrelevant to a determination of the lawfulness of the legislation. *Horizon House*, 804 F.Supp. at 694.

Moreover, the "legitimate governmental purpose" proffered by the defendants in this case does not under the FHAA validate the legislative provisions. Courts have held that "integration is not an adequate justification under the FHAA." *Id.* at 695 (citing *United States v. Starrett City Associates*, 840 F.2d 1096 (2d Cir.1988)). The neighbor notification rule, and defendants' proffered justifications for it, necessarily assume that people with disabilities are different from people without disabilities and must take special steps to "become a part of the community." This requirement is equally as offensive as would be a rule that a minority family must give notification and invite comment before moving into a predominantly white neighborhood. The obvious result of these notifications to neighbors is the antithesis of the professed "integration" goal of defendants. Indeed, notices of this sort galvanize neighbors in their opposition to the homes.[10]

---

9. Defendants contend that the regulation is not discriminatory because it also applies to group homes for disadvantaged youths. There is no merit to this argument. The parties agree that the vast majority of group homes to which the regulation applies provide housing for the disabled. The fact that the notice regulation "may also incidentally catch in its net some group homes that serve individuals without handicaps does not vitiate the facial invalidity of the rule which clearly restricts the housing choices of people based upon their handicaps." *Horizon House*, 804 F.Supp. at 694.

10. The clear evidence in this record that the notifications have stirred neighborhood opposition is similar to research findings that have been made. *See* M. Jaffe & T. Smith, American Planning Ass'n, Planning Advisory Serv.Rep. No. 397, *Sitting Group Homes for Developmentally Disabled Persons*, at 31–33 (Hecimovich ed. 1986). The report concluded that a low-profile sitting approach best facilitates integration into the community. *Id.*

The discriminatory purpose of the rule is evident on the face of provisions of the Code. The neighbor notification requirement was designed to provide "[a]n opportunity . . . for residents of the proposed group residential care facility to comment on the proposed use and provide continuing input to responsible county agencies regarding the *compatibility* of the group residential care facility within the neighborhood." (emphasis added). The proposed revisions to the Code, relied upon by defendants here, would delete only this offensive preamble from the legislation, leaving the notice requirement itself intact. Such a transparent attempt to achieve facial neutrality would merely hide the offensive purpose of the regulation and would not cure its illegality under the FHAA. *Horizon House,* 804 F.Supp. at 689.

Defendants' argument that "a fair housing problem arises only when the community opposition becomes the basis for denial of an application" is also without merit. Courts have consistently held that discriminatory procedural requirements are themselves violative of the FHAA. *McKinney Foundation,* 790 F.Supp. at 1218 (special exception process violates the FHAA); *Ardmore v. City of Akron,* Ohio No. 90–1083, 1990 WL 385236 (N.D.Ohio Aug. 2, 1990) (conditional use permit process violates the FHAA). Moreover, the record here clearly establishes that the neighbor notification process has caused a great deal of harm to the plaintiffs, provoking petitions and letter writing campaigns in opposition to the proposed group homes. The resulting stigma to plaintiffs Neuhaus and Stokoe and other residents of Potomac's group homes is not easily erased.

For these reasons, this Court concludes that the neighbor notification provisions of the Code and the Regulations violate § 3604(f)(1) of the FHAA and are therefore invalid.

### (c)

### Program Review Board Hearings

The Court will next address the legality of the program review board hearing process. While plaintiffs have not shown that this regulation is facially invalid, the further question presented is whether the rule, as applied to the plaintiffs in this case, has a discriminatory effect under the FHAA. As noted hereinabove, the program review board "requirement" is only selectively enforced when there is significant community opposition. When program review board hearings are held, neighbors and civic organizations are represented on the board, while a provider like Potomac is not. Although group homes for no more than eight elderly residents may be legally located in residential areas under County zoning law, a considerable amount of time at review board hearings is spent on nonprogrammatic concerns raised by the neighborhood representative on the board, such as "the character of the neighborhood" and the effect which the group home would have on property values.

Applying the *Smith* test in determining whether defendants' housing practice has a discriminatory effect in this case, the Court has first concluded that plaintiffs have made a strong showing of discriminatory effect. Like the neighbor notification rule, program review board hearings are held under the challenged requirement only for residential facilities for the disabled. No other type of residential home in Montgomery County is subject to public scrutiny of this sort. In *McKinney,* the Court held that a similar public hearing process had a discriminatory impact on people with disabilities "because it holds the future tenants up to public scrutiny in a way that seven unrelated [non-handicapped] persons would not be." 790 F.Supp. at 1219. Similarly, in this case, the public scrutiny that is imposed on persons with disabilities has the effect of discriminating against future elderly residents of Potomac's group homes.

The fact that community concerns and community prejudices often dominate these hearings also causes a discriminatory impact upon Potomac's future residents. *Casa Marie, Inc.,* 752 F.Supp. at 1169; *Commonwealth of Puerto Rico,* 764 F.Supp. at 224. Although defendants themselves may not harbor prejudices of this sort against the handicapped elderly, they have designed and utilized a regulatory procedure which facilitates the expression of these prejudices and which gives weight to such views in the process. *A.F.A.P.S.,* 740 F.Supp. at 104 ("a

decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process"). *See also McKinney Foundation,* 790 F.Supp. at 1212.

It is apparent to the Court that the presence of a neighborhood representative on the board contributes to the discriminatory effect which the hearings have on the handicapped elderly. The neighborhood organizations are represented at all times by at least one board member, and the record discloses that it is this person who makes many comments and statements during the hearings. As might be expected, most of the discussion of non-programmatic issues during the hearings results from comments and statements of this representative. Because these are regular and expected occurrences, defendants have, by following the program review board hearing process, unjustifiably given undue weight to the opinions of the neighbors at the hearings. In so doing, defendants have acted in a manner which is unfair and prejudicial to Potomac and its future elderly residents. In responding to plaintiffs' motion, defendants have in fact recognized the illegality of having a neighborhood representative on the board and have suggested to the Court that they will delete this requirement from the Code. However, there has as yet been no such amendment of the Code, and the Court's rulings herein are based on the County's licensing law in its present form.

Moreover, the selective enforcement of the requirement that a board hearing be held exacerbates the prejudice to the plaintiff. *See A.F.A.P.S.,* 740 F.Supp. at 105. What makes the discriminatory effect particularly egregious in this case is that hearings are consistently held because of public opposition to the group homes and for the purpose of appeasing neighboring residents.[11] This particular procedural step, which is based essentially on illegal prejudices of the community, causes great harm to plaintiffs because of resulting delays and burdensome costs. *See McKinney Foundation,* 790 F.Supp. at 1220.

Under the second prong of the *Smith* test, the Court must consider whether there is any evidence of discriminatory intent. On the record here, the Court finds and concludes that the manner in which the defendants apply the board hearing requirement is strong evidence of their intent to appease neighborhood opponents of group homes. *C.f. Horizon House,* 804 F.Supp. at 696 (court found evidence of discriminatory intent where spacing ordinance "was a response to community opposition and to outmoded fears about people with mental retardation"). Evidence of record reveals that the County holds a hearing when there is strong community opposition and forgoes the requirement when there is no community opposition. Plaintiffs have accordingly satisfied their burden under the second prong of the *Smith* test.

Under the third prong of the *Smith* test, the Court must determine whether defendants have any legitimate interest in the enforcement of the board hearing requirement in a manner which would give weight to community views. The record in this case reveals that defendants can, and frequently do, review providers' program statements without even holding a public board hearing, especially where, as here, a particular provider has previously had its program statement approved in connection with another group home. Moreover, evidence of record indicates that neighborhood representatives as a group have no particular expertise concerning programmatic issues, such as the type of care which should be provided and the appropriate staffing for a particular group home. Rather than assisting defendants in assessing the programmatic aspects of a provider's statement, neighborhood representatives most often direct the attention of licensing officials away from legitimate concerns. As such, it is apparent to the Court that any legitimate regulatory interest of defendants in reviewing a provider's program by way of holding a public hearing of this sort is minimal.

---

11. Defendants have asserted that community opposition does not trigger the decision to convene a board hearing. In so doing, defendants have attempted to discredit the deposition testimony of their own employees. The record here discloses that there was substantial community opposition in each case in which a board hearing was held.

The last prong of the *Smith* test considers the type of relief requested by plaintiffs.

> Generally, if a plaintiff is suing only to require a public defendant to eliminate some obstacle to housing that plaintiff itself will provide, rather than to compel the public defendant to build housing, defendant normally has to establish somewhat more substantial justification for its adverse action than would be required if defendant were defending its decision not to build.

*A.F.A.P.S.*, 740 F.Supp. at 107. In this case, plaintiff Potomac is merely asking that defendants remove procedural obstacles so that it may more freely provide housing to the disabled elderly in Montgomery County. In view of the relief sought here by Potomac, plaintiff has also satisfied this prong of the *Smith* test.

■ Having concluded that on this record each of the four *Smith* factors favors plaintiffs, the Court will next consider whether defendants can establish legitimate justification for their procedures and show that there are no less discriminatory alternatives available. *McKinney Foundation*, 790 F.Supp. at 1220. A review of the record in a light most favorable to defendants reveals that the board hearing requirement, as applied in this case, is perhaps the *most* discriminatory method available for reviewing a provider's program statement. As discussed hereinabove, defendants often review a provider's statement without holding a public hearing. Furthermore, neighbors as a group have no particular expertise which might be useful in assisting licensing officials in their review of the statements of prospective group home providers. To the extent that the hearings address legitimate programmatic matters, there are less discriminatory alternatives available to satisfy the County's legitimate concerns. *McKinney Foundation*, 790 F.Supp. at 1220. If the defendants need information from a provider regarding its program statement, "there are less formal means to obtain it." *Id.*

■ Defendants have argued that state law requires them to hold an "open meeting" when a program review board is convened to consider a provider's application. Md.State Gov't Code Ann. § 10–503(b)(1) (hereinafter "the Open Meetings Act"). However, this Court has concluded under federal law that a much less discriminatory method exists whereby defendants may adequately review a provider's program statement. Defendants' legitimate needs can be met by a non-public meeting of the board at which experts would consult and consider the programmatic aspects of a provider's statement. The even-handed application of such a requirement would not violate the FHAA. To the extent that the state Open Meetings Act "stands as an obstacle to the accomplishment of the full purposes and objectives" of the FHAA, it may not be enforced. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). On the record here, this Court has concluded that public program review board hearings, as held in connection with the applications of Potomac for their group homes, have a discriminatory effect on plaintiffs in violation of the FHAA. Under the Supremacy Clause, the Maryland Open Meetings Act, if it applies here, is preempted by the FHAA, inasmuch as a state law would then stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Silkwood*, 464 U.S. at 248, 104 S.Ct. at 621.

Applying all of the factors of *Smith* to the circumstances here, the Court has concluded that the program review board requirement, as applied to these plaintiffs, has a discriminatory effect in violation of the FHAA.[12] Accordingly, plaintiffs' motion for summary judgment as to Count II will be granted, and defendants' motion for summary judgment as to Count II will be denied.

(d)

*"Exceptional Person"*

■ The Court will next address the validity under the FHAA of defendants' "ex-

---

12. As noted, the determinations made herein by the Court are based on existing provisions of the Code and the manner in which they have previously been applied by the defendants. The Court is expressing no opinion on the proposed revisions to the Code which would alter the board hearing provisions.

ceptional person" rule. As noted herein-above, the rule is a "broad" and "rigid yard-stick" for determining who may and who may not live in a group home. Both plaintiffs and defendants have construed the "exceptional person" rule to mean that individuals who cannot exit from a group home on their own are excluded from living in that type of residential community, whatever may be those individuals' actual safety and health needs.

In their arguments to the Court, defendants seek to disavow the plain language of Chapter 23A. In opposing plaintiffs' motion, defendants have advanced interpretations of the exceptional person rule which are not reflected in its language, its history, or its prior application by the defendants. Defendants concede that the exceptional person rule no longer serves the fire and safety purpose for which it was originally enacted. Nevertheless, they assert that the rule is somehow "intertwined with the level of care issue." [13] However, the term "level of care" appears nowhere in the rule, which makes no reference whatsoever to the capacities or needs of group home residents. In their depositions, the individual defendants struggled in their attempt to explain how the mobility of potential group home residents would determine whether they were appropriately placed at such a facility and whether such a facility would provide an appropriate level of care. As defendant Carty candidly admitted at his deposition, there is no necessary correlation between the need for nursing care and the ability or inability of a resident to independently exit from the home. Indeed, the vacillation by County witnesses concerning any reasonable rationale for the exceptional person rule suggests to the Court that none exists.

In *Marbrunak v. City of Stow,* 974 F.2d 43 (6th Cir.1992), the Sixth Circuit considered the application of onerous fire and safety requirements to four mentally retarded adult

women who sought to live in a single-family residential district. The Sixth Circuit affirmed the district court's conclusion that requiring the four retarded women to comply with fire and safety code requirements which were more onerous than requirements imposed on non-handicapped individuals constituted disparate treatment under the FHAA. *Id.* at 47. The Court reasoned that the defendant had made "no attempt at individualizing its requirements to the needs or abilities of particular kinds of developmental disabilities" and that the defendant's ordinance was therefore "over-broad and over-inclusive." *Id.* at 47–48.[14]

Applying a disparate treatment analysis to the exceptional person rule, this Court concludes that the rule, as applied by the defendants in this case, irrationally excludes the elderly from group homes based on their disabilities, and therefore constitutes disparate treatment under the FHAA. Like the fire and safety requirements in *Marbrunak,* the exceptional person regulation has no necessary correlation to the actual abilities of the persons upon whom it is imposed, and it therefore unreasonably limits their opportunities to live in the community of their choice. Evidence produced by the families and physicians of plaintiffs Neuhaus and Stokoe establish that they are being well cared for and have been appropriately placed at Golden Guardian. The regulation prohibits plaintiffs Neuhaus and Stokoe from living at Golden Guardian simply because of their disabilities, without regard to actual safety considerations. It is thus illegal under the FHAA. *See Cason,* 748 F.Supp. at 1004 (court concluded that rule that excluded from public housing all persons who were incapable of "liv[ing] independently" violated the FHAA).

In sum, the record in this case reveals that defendants have insisted upon applying the exceptional person rule for purposes of ad-

---

13. Defendants have contended in particular that the real test for group home placement is whether a proposed resident can self-medicate. Even assuming that this is now the rationale for the "exceptional person" rule, the record clearly reveals that plaintiffs Neuhaus and Stokoe have been ordered to leave Golden Guardian because they cannot self-transfer and not because of any inability on their part to self-medicate.

14. The Court did note that the city could impose some additional safety requirements on housing for persons with disabilities, but that such requirements must be "warranted by the unique and specific needs and abilities of those handicapped persons." *Id.* 974 F.2d at 47.

ministrative convenience, even though they recognize that it is overbroad. As such, the application of the exceptional person definition by defendants to plaintiffs Neuhaus and Stokoe violates the FHAA. *Horizon House,* 804 F.Supp. at 698 (regulation was "overbroad for the asserted purpose"). Accordingly, plaintiffs' motion for summary judgment as to Count I will be granted, and defendants' motion for summary judgment as to Count I will be denied.

### (e)
### The ADA

In Count III of the amended complaint, plaintiffs Neuhaus and Stokoe have also asserted that the exceptional person rule, on its face and as applied, violates their rights under the ADA. Plaintiffs in this case have placed primary emphasis on enforcing their rights under the FHAA, and have devoted little attention to developing a legal analysis under the newer ADA. The parties have cited no cases which have considered the application of the ADA to facts similar to those presented in this case.

On the record here, the Court is satisfied that neither plaintiffs nor defendants have met their burden of showing that they are entitled to summary judgment as to Count III. Moreover, the issue is essentially a moot one insofar as the plaintiffs are concerned.[15] Since the Court has already concluded that the application of the exceptional person rule to plaintiffs Neuhaus and Stokoe violates the FHAA, plaintiffs are entitled to the declaratory relief which they are seeking in this case. If plaintiffs wish to press their claim under Count III, or if defendants wish to press their defense to that Count, they may do so in future proceedings in this case after further development of the law and the facts. Both motions for summary judgment as to Count III will accordingly be denied.

### (f)
### Retaliation

■■■ Defendants seek summary judgment on Count IV of plaintiffs' amended complaint, which asserts a claim for retaliation. In their amended complaint, plaintiffs point to several actions taken by defendants which they contend constitute retaliation by defendants. First, plaintiffs contend that eight days after they filed this suit, defendants informed Potomac that they planned to hold a program review board hearing for Pepper House. As a second alleged act of retaliation, Potomac points to a May 21, 1992 deficiency letter issued by the County on Golden Guardian. The letter demanded the prompt correction of numerous deficiencies allegedly discovered by defendant Beach during an inspection of Golden Guardian which had taken place two months earlier on March 18, 1992.[16] Potomac also contends that, as a third act of retaliation, the County conducted a surprise inspection of Golden Guardian on May 27, 1992, which focussed almost entirely on record keeping matters.

Defendants argue that the issuance of the deficiency letter, the Golden Guardian inspection and the program review board hearing requirement for Pepper House were all valid exercises of the County's regulatory function. Although there is some evidence supporting defendants' assertions, the timing of the deficiency orders issued immediately after this lawsuit was filed, and the extent to which the inspection procedures deviated from those ordinarily used by the County, raise inferences which support plaintiffs' claim of illegal retaliation.

An analysis of the merits of plaintiffs' claim of retaliation requires a determination of the subjective intent of the defendants in engaging in the challenged actions. The resolution of this claim will in large part be based upon the credibility of the witnesses at trial, and cannot be resolved by way of defendants' motion for summary judgment. *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Defendants' motion for summary judgment as to Count IV will accordingly be denied.

---

**15.** Indeed, plaintiffs' prayer for relief in their amended complaint does not request a declaratory judgment under the ADA.

**16.** The letter gave Potomac until May 31, 1992 to correct certain deficiencies and until June 10,

1992 to correct certain other deficiencies. Defendants agreed to delay enforcement of the letter until ten days following this Court's ruling on Potomac's second motion for a preliminary injunction.

## IV

### *Conclusion*

In summary, the Court has concluded that the three challenged provisions of Montgomery County licensing law—the neighbor notification rule, the review board hearing requirements and the "exceptional person" definition—violate the FHAA. When Congress enacted the FHAA, it required local governmental bodies to remove discriminatory impediments which would prevent disabled persons from living where they choose. Rather than revising its Code and Regulations in order to comply with the FHAA, Montgomery County has chosen to advance inadequate rationales for the challenged provisions. Defendants will be required to conform these provisions of Chapter 23A of the Code and of the Regulations to the FHAA. *Marbrunak*, 974 F.2d at 48.

Judgment as to liability will be entered in favor of plaintiffs as to both Count I and Count II. Both motions for summary judgment will be denied as to Count III. There is a disputed issue of material fact which prevents the entry of summary judgment in defendants' favor as to Count IV. Accordingly, defendants' motion for summary judgment will be denied in its entirety, and plaintiffs' motion for partial summary judgment will be granted as to Counts I and II but denied as to Count III. An appropriate Order will be entered by the Court.