Miriam WEINSTEIN; Hyman Weinstein, Deceased; Heirs–At–Law of the Deceased; Estate of Hyman Weinstein, Deceased, Complainants–Appellees,

and

The Colorado Civil Rights Commission, Appellee,

v.

CHERRY OAKS RETIREMENT COMMUNITY, Cherry Oaks Company, Steve Shraiberg, Alfred S. Blum, Urban Property Management, Inc., d/b/a/ Urban, Inc., and June O'Neill, Respondents–Appellants.

No. 95CA0750.

Colorado Court of Appeals, Div. II.

April 4, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Jill M.M. Gallet, Assistant Attorney General, Denver, for Appellee.

Holland & Hart, Michael D. Martin, Jimmy Goh; Urban, Inc., Alfred S. Blum, Denver, for Respondents–Appellants.

Opinion by Judge HUME.

Respondents, Cherry Oaks Retirement Community, Cherry Oaks Company, Steve Shraiberg, Alfred S. Blum, Urban Property Management, Inc., d/b/a Urban, Inc., and June O'Neill (Cherry Oaks) appeal the order of the Colorado Civil Rights Commission (Commission) finding that their actions toward complainants, Miriam Weinstein and the estate and heirs of Hyman Weinstein, deceased, constituted discriminatory and unfair housing practices in violation of the Colorado Fair Housing Act (CFHA), § 24–34–501, et seq., C.R.S. (1988 Repl.Vol. 10A). We affirm.

Cherry Oaks Retirement Community is a privately-owned, residential care facility for senior citizens who have impaired capacity to live independently but are not totally bedfast or in need of 24–hour medical or nursing care. It is licensed as a "personal care boarding home," and is therefore subject to regulations promulgated by both the State of Colorado and the City and County of Denver departments of health. Department of Health Regulation No. 7.2, 6 Code Colo. Reg. 1011–1, requires a licensed facility to develop and implement criteria for the admission and discharge of its residents based upon the identified needs of residents that the facility is capable of meeting.

Prior to 1992, Cherry Oaks had implemented a policy requiring facility residents who use wheelchairs or walkers to transfer to ordinary chairs when taking meals in the dining room. The wheelchairs and walkers were then removed from the dining room and placed in another room. The purpose of this policy, according to the executive director of the facility, was to allow Cherry Oaks' personnel an opportunity to observe residents regularly and to ensure that they were physically appropriate to remain at the boarding home.

In March 1992, Hyman and Miriam Weinstein visited the Cherry Oaks facility in the process of selecting a personal care residence. As part of their visit, they ate in the dining room, and Mr. Weinstein sat in his wheelchair during that meal. Later that same month, the Weinsteins entered into a one-year lease with Cherry Oaks. At that time Mr. Weinstein was ambulatory although he required the use of a walker and, occasionally, a wheelchair. He was able to transfer from his walker or wheelchair to an ordinary chair without assistance.

In June 1992, Mr. Weinstein's physical condition began to deteriorate as a result of amyotrophic lateral sclerosis (Lou Gehrig's disease). The transfer from wheelchair to dining room chair became increasingly difficult and painful. In late November or early December 1992, the Weinsteins asked that Mr. Weinstein be allowed to take his meals in his wheelchair.

For a short time, Mr. Weinstein was allowed to remain in his wheelchair at an isolated table. However, Cherry Oaks later discontinued that practice and offered instead to provide two aides at no cost to the Weinsteins to assist Mr. Weinstein in making the transfer.

The Weinsteins were told that wheelchairs did not look good in the dining room, that allowing wheelchairs in the dining room would be a violation of the city fire code, that regulations required such transfers, and that allowing one wheelchair in the dining room would lead to requests from others for the same treatment. At no time did Cherry Oaks tell the Weinsteins or their family that they were no longer eligible to remain as

residents or inform them that Mr. Weinstein's failure to make the transfer at mealtimes could result in their discharge from the facility.

As a result of Cherry Oaks' refusal to allow Mr. Weinstein to take his meals while remaining in his wheelchair, the Weinsteins began taking all their meals in their apartment and moved out at the end of their lease term. There is no evidence in the record as to whether Mr. Weinstein was ever asked to demonstrate his ability to transfer after he quit coming to the dining room for meals.

The Weinsteins filed a complaint with the Commission alleging that Cherry Oaks' policies and conduct in refusing to allow Mr. Weinstein to remain seated in his wheelchair for meals constituted a discriminatory and unfair housing practice based on his disability in violation of §§ 24–34–502(1)(a), 24–34–502.2(1)(b), & 24–34–502.2(2)(b), C.R.S. (1995 Cum.Supp.). The complaint was pursued by Miriam Weinstein and Hyman Weinstein's heirs and estate after his death in May 1993.

Following a hearing, an Administrative Law Judge (ALJ) determined that Cherry Oaks' policies and conduct discriminated against Mr. Weinstein solely on the basis of his disability. The findings and conclusions of the ALJ were generally adopted by the Commission on appeal. The Commission's final decision altered only the amount of monetary sanctions that had been awarded by the ALJ's preliminary order.

Respondents contend that the Commission erred in determining that Cherry Oaks engaged in discriminatory practices in violation of the CFHA, arguing that the facility's policy requiring residents to transfer from their wheelchairs to dining room chairs for meals did not discriminate against Hyman Weinstein on the basis of his disability. We disagree.

 According to §§ 24–34–502(1)(a) and 24–34–502.2(1)(b), the refusal or denial of equal terms, conditions, or privileges of housing, including rental housing, to individuals with a disability is prohibited. Discrimination under the CFHA includes the refusal to make reasonable accommodations in rules, policies, practices, or services when such ac-

commodations may be necessary to afford disabled persons an equal opportunity to use and enjoy a dwelling. Section 24–34–502.2(2)(b), C.R.S. (1995 Cum.Supp.). "Reasonable accommodation" may be defined as changing a rule that may be otherwise generally applicable so as to make its burden less onerous on a disabled individual. *See North Shore–Chicago Rehabilitation Inc. v. Skokie*, 827 F.Supp. 497 (N.D.Ill.1993)(to avoid being found in violation of federal fair housing act, party accused of discrimination must show that no reasonable accommodation could be made).

Residential care facilities must comply with all applicable local zoning, housing, fire, and sanitary codes and ordinances of the city and county where they are located to the extent that such codes are consistent with the federal Fair Housing Amendment Act, 42 U.S.C. 3601, et seq. (1988). *See* Denver Department of Health & Hospitals Regulation 4.1 (1976).

Individuals are not admitted or permitted to remain as residents in a personal care boarding home if they have physical limitations that prevent ambulation unless such limitations are adequately compensated by artificial means. Further, residents must be able to enter and leave wheelchairs and walkers without assistance. Denver Department of Health & Hospitals Regulation 2.8 (1976).

 In determining whether a regulatory agency's order should stand, the question is not whether a reviewing body would reach the identical conclusion upon the evidence but whether, based upon the entire record, the findings are supported by substantial evidence. *Colorado Civil Rights Commission v. State*, 30 Colo.App. 10, 488 P.2d 83 (1971). An agency's determination is to be accepted if it has support in the record and a reasonable basis in the law. *Ricci v. Davis*, 627 P.2d 1111 (Colo.1981).

Because the CFHA is almost identical to the federal Fair Housing Amendment Act, federal case authority is deemed persuasive in interpreting the provisions of the CFHA. *See* Civil Rights Commission Rules 30.0 & 60.1(C), 3 Code Colo. Reg. 708–1.

■ To prevail under the CFHA, a complainant may demonstrate that the challenged regulation discriminates against disabled persons on its face and serves no legitimate government interest. Alternatively, a complainant must show either discriminatory intent or discriminatory impact. Discriminatory intent is proved by showing that disabilities like those of the complainant were, in some part, the basis for the policy being challenged. *See Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285 (D.Md.1993). Discriminatory impact is shown by proof that a given policy or practice has a greater impact upon disabled than non-disabled persons. *See Cason v. Rochester Housing Authority,* 748 F.Supp. 1002 (W.D.N.Y. 1990).

■ Once a complainant demonstrates a prima facie case of discriminatory action, the burden shifts to the respondent to present legitimate, bona fide reasons for such action and to show that no less discriminatory alternative was available. *See Potomac Group Home Corp. v. Montgomery County, supra.* If some basis is advanced in support of the legitimacy of challenged actions or policies, then the complainant may demonstrate that such basis is pretextual. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Here, the ALJ determined that Cherry Oaks' transfer policy violated the CFHA under both the discriminatory intent and the discriminatory impact tests. The ALJ found that Mr. Weinstein was denied the full use and enjoyment of the communal dining room by the unyielding enforcement of the facility's policy requiring him to transfer from his wheelchair in order to take meals there; that the "legitimate" reasons advanced by Cherry Oaks for disallowing wheelchairs in the dining room were pretextual; and that neither fire code regulations nor other state or local regulations prohibited the residents' use of wheelchairs in the dining room. The ALJ also determined that, because aides were present to help residents transfer to and from dining room chairs, the transfer policy was not an effective means of determining which individuals could not enter or leave their wheelchairs without assistance.

Further, in spite of the facility's transfer policy and requirement that persons not capable of remaining at Cherry Oaks be asked to leave, Mr. Weinstein was not asked to leave. In fact, respondent O'Neill testified that she thought Mr. Weinstein was still able to enter or leave his chair without assistance and thus was eligible to remain at Cherry Oaks even though his family refused to allow him to transfer at mealtimes.

The ALJ concluded that the real reason for the transfer policy was to maintain a "disability-free" atmosphere at Cherry Oaks rather than to determine eligibility to remain at the facility. O'Neill and the dining room manager both stated that wheelchairs in the dining room did not "look good." Co-respondent Blum, who also was counsel for Cherry Oaks, wrote in respondents' brief that: "Cherry Oaks is designed to provide senior citizens a relaxing, comfortable atmosphere, *free from any semblances of a gloomy, septic hospital environment.*" (emphasis added)

The ALJ found that Cherry Oaks did not present a legitimate reason for the transfer policy. Respondents argue that the transfer policy was an appropriate means of gauging whether a resident had physical needs that exceeded those which the facility could provide. However, conditioning wheelchair or walker accommodated persons' dining room privileges on the arbitrary testing policy was not a reasonable method of determining appropriateness to remain in the facility.

On these findings, the ALJ concluded that because Mr. Weinstein's disability was in some part the basis of Cherry Oaks' application of and refusal to alter its transfer policy, discriminatory intent had been demonstrated.

We agree with the ALJ's determination that Cherry Oaks has not presented a legitimate reason for its transfer policy. Further, we agree that Cherry Oaks has not met its burden of establishing that no reasonable accommodation could have been made to allow Mr. Weinstein full use and enjoyment of the dining room unless or until his ineligibili-

ty to remain in the facility had been established.

Our review of the record satisfies us that sufficient evidence exists to support the ALJ's findings of fact and ultimate determination that Cherry Oaks engaged in discriminatory and unfair housing practices. Thus, we conclude that the Commission did not err in determining Cherry Oaks to be in violation of the Colorado Fair Housing Act as alleged in the Weinsteins' complaint.

The order is affirmed.

DAVIDSON and QUINN*, JJ., concur.